PEOPLE v CIPRIANO

PEOPLE v DEAN

PEOPLE v HARRISON

Docket Nos. 77682, 77683, 78035, 78446. Argued June 2, 1987 (Calendar Nos. 2-4). Decided September 16, 1988. Rehearing denied in *Cipriano, post,* 1206.

Giovani Cipriano was convicted by a jury in the Otsego Circuit Court, William A. Porter, J., of two counts of first-degree murder. The Court of Appeals, DANHOF, C.J., and MacKENZIE and M. E. DODGE, JJ., affirmed in an unpublished opinion per curiam (Docket No. 64786). On remand, the Court of Appeals, DANHOF, C.J., and MacKENZIE and HOLBROOK, JR., JJ., again affirmed in an unpublished memorandum opinion (Docket No. 85841).

Nathan Dean was convicted by a jury in the Detroit Recorder's Court, Leonard Townsend, J., of three counts of first-degree murder and possession of a firearm during the commission of a felony. The Court of Appeals, BRENNAN, P.J., and KAUFMAN and E. E. BORRADAILE, JJ., affirmed (Docket No. 51849). On remand, the Court of Appeals, BRENNAN, P.J., and BURNS and ALLEN, JJ., again affirmed in an unpublished memorandum opinion (Docket No. 87267).

Dwight A. Harrison was convicted by a jury in the Wayne Circuit Court, Harry J. Dingeman, J., of voluntary manslaughter. The Court of Appeals, BURNS, P.J., and GILLIS and J. P. SWALLOW, JJ., affirmed in an unpublished opinion per curiam (Docket No. 78182).

The defendants appeal, alleging that unnecessary delays in their arraignments rendered confessions made during the prearraignment delays involuntary and thus inadmissible.

In an opinion by Justice GRIFFIN, joined by Chief Justice

REFERENCES

Am Jur 2d, Evidence §§ 526 *et seq.,* 543 *et seq.*

Admissibility of confession or other statement made by defendant as affected by delay in arraignment—Modern state cases. 28 ALR4th 1121.

Riley and Justices Brickley and Boyle, the Supreme Court *held:*

Unnecessary delay prior to arraignment is only one factor to be taken into account in evaluating the voluntariness of a confession. If the totality of the surrounding circumstances indicates that a confession was voluntarily given, it should not be excluded from evidence solely because of prearraignment delay.

1. A person who is arrested must be arraigned without unnecessary delay. Such delay will not render a confession made during the period of delay inadmissible, rather it is only one of the factors that should be considered in evaluating the voluntariness of a confession. The test of voluntariness should be whether, considering the totality of all the surrounding circumstances, the confession is the product of an essentially free and unconstrained choice by its maker or whether the accused's will has been overbourne and the capacity for self-determination critically impaired.

2. An otherwise competent confession should not be excluded solely because of a delay in arraignment. In determining whether a statement is voluntary, a trial court should consider an accused's age, lack of education, and intelligence level; the extent of the accused's previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention before the statement in question was given; the lack of any advice of constitutional rights; whether there was an unnecessary delay in bringing the accused before a magistrate before the confession was given; whether the accused was injured, intoxicated, drugged, or in ill health when the statement was made; whether the accused was deprived of food, sleep, or medical attention, or was physically abused or threatened with abuse. The absence or presence of any one of these factors is not necessarily conclusive on the issue of voluntariness. The ultimate test of admissibility is whether the totality of the circumstances surrounding the making of the confession indicates that it was freely and voluntarily made. Unnecessary delay in arraignment is but one factor to consider in reaching this conclusion, the focus being not just on the length of delay, but rather on what occurred during the delay and its effect on the accused. However, a prolonged, unexplained delay prior to arraignment should be a signal to the court that the voluntariness of a confession may have been impaired.

3. In *Cipriano,* considering the totality of the circumstances, there was no indication on the record of a coercive atmosphere

during the prearraignment delay, leading to the conclusion that his confessions were voluntary and admissible. In *Dean,* the voluntariness of the defendant's confession was conceded by the defendant and supported by the evidence; thus the confession was admissible. In *Harrison,* the defendant was arrested for a cognizable offense, larceny of an automobile, not merely for investigation of a murder. Thus, his arrest was lawful. The delay between his arrest and arraignment was a result of attempts by police to verify the defendant's progression through four different explanations as to how he came to possess the decedent's automobile. There was no evidence that his confession was involuntary; rather, his statements were the products of a voluntary decision based on his knowledge of his constitutional rights and of his failure of a polygraph examination, and thus admissible.

Affirmed.

Justice CAVANAGH, joined by Justices LEVIN and ARCHER, dissenting, stated that a person arrested without a warrant is required to be brought before a judicial officer without unnecessary delay for prompt arraignment. Where a confession or statement is obtained by the police by exploitation of a violation of the prompt arraignment statute, exclusion is appropriate. However, the majority rejects exclusion solely on the basis of violations of the prompt arraignment statute, and instead substitutes inquiry regarding the voluntariness of a confession under the totality of the surrounding circumstances, with prearraignment delay being only one consideration, thereby improperly equating the requirement of prompt arraignment with other factors which the Legislature has not seen fit to codify as a statutory right.

In these cases, the defendants were arrested without warrants, and their arraignments were delayed for two days or more in clear violation of the prompt arraignment statute. In *Dean,* the statement obtained from the defendant after the reverse-writ proceeding may have added significantly to other evidence tending to show that he was the killer, requiring reversal and remand for a new trial. In *Cipriano,* although the evidence, other than the statements obtained after the search warrant proceeding, was overwhelming, the statements may have added significantly to other evidence showing that the killings were premeditated, requiring a reduction of the defendant's conviction to second-degree murder and a remand for resentencing. In *Harrison,* the delay did not deprive the defendant of legal representation or otherwise impede his right to counsel. Thus, his conviction should be affirmed.

1. CRIMINAL LAW — EVIDENCE — CONFESSIONS — VOLUNTARINESS —
      PREARRAIGNMENT DELAY.

   Unnecessary delay prior to arraignment is only one factor to be
   taken into account in evaluating the voluntariness of a confes-
   sion; if the totality of the surrounding circumstances indicates
   that a confession was voluntarily given, it should not be ex-
   cluded from evidence solely because of prearraignment delay
   (MCL 764.13, 764.26; MSA 28.871[1], 28.885).

2. CRIMINAL LAW — EVIDENCE — CONFESSIONS — VOLUNTARINESS —
      PREARRAIGNMENT DELAY.

   A confession should be determined to be voluntary where, consid-
   ering the totality of the circumstances, it is the product of an
   essentially free and unconstrained choice by its maker; in
   determining voluntariness, a trial court should consider an
   accused's age, lack of education, and intelligence level; the
   extent of the accused's previous experience with the police; the
   repeated and prolonged nature of the questioning; the length of
   the detention before the statement in question was given; the
   lack of any advice of constitutional rights; whether there was
   an unnecessary delay in bringing the accused before a magis-
   trate before the confession was given; whether the accused was
   injured, intoxicated, drugged, or in ill health when the state-
   ment was made; whether the accused was deprived of food,
   sleep, or medical attention, or was physically abused or threat-
   ened with abuse; the absence or presence of any one of these
   factors is not necessarily conclusive on the issue of voluntari-
   ness (MCL 764.13, 764.26; MSA 28.871[1], 28.885).

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *Norman R. Hayes,* Prosecuting Attorney, and *Thomas C. Johnson,* Assistant Attorney General, for the people in *Cipriano.*

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *John D. O'Hair,* Prosecuting Attorney, *Timothy A. Baughman,* Chief, Criminal Division, Research, Training and Appeals, and *Larry L. Roberts,* Assistant Prosecuting Attorney, for the people in *Dean,* and *Jeffrey Caminsky,* Assistant Prosecuting Attorney, for the people in *Harrison.*

*William R. Stackpoole* for defendant Cipriano. ·

*Hoffa, Chodak & Robiner* (by *Norman R. Robiner* and *Robert F. Harrington*) for defendant Dean.

State Appellate Defender (by *Susan M. Meinberg*) for defendant Harrison.

Griffin, J. Michigan statutory law requires that an arrested person be brought before a magistrate for arraignment "without unnecessary delay." MCL 764.13, 764.26; MSA 28.871(1), 28.885.[1] In each of these three cases, consolidated on appeal, we must determine the effect of this statutory requirement upon the admissibility of a confession obtained during a period of prearraignment delay. We hold that "unnecessary delay" prior to arraignment is only one factor to be taken into account in evaluating the voluntariness of a confession. If the totality of the surrounding circumstances indicates that a confession was voluntarily given, it shall not be excluded from evidence solely because of prearraignment delay.

---

[1] MCL 764.13; MSA 28.871(1) provides:

A peace officer who has arrested a person for an offense without a warrant shall without unnecessary delay take the person arrested before a magistrate of the judicial district in which the offense is charged to have been committed, and shall present to the magistrate a complaint stating the charge against the person arrested.

MCL 764.26; MSA 28.885 states:

Every person charged with a felony shall, without unnecessary delay after his arrest, be taken before a magistrate or other judicial officer and, after being informed as to his rights, shall be given an opportunity publicly to make any statement and answer any questions regarding the charge that he may desire to answer.

I

More than three decades ago, the United States Supreme Court addressed the evidentiary consequences of illegal prearraignment detention in two landmark cases, *McNabb v United States,* 318 US 332; 63 S Ct 608; 87 L Ed 819 (1943), reh den 319 US 784 (1943), and *Mallory v United States,* 354 US 449; 77 S Ct 1356; 1 L Ed 2d 1479 (1957). In those cases, the Court determined that the right of a suspect to prompt arraignment should be enforced by automatically excluding from evidence any incriminating statement obtained during a period of "unnecessary delay," even though the confession was not the result of physical or psychological coercion. This rule of exclusion became known as the *"McNabb-Mallory* rule."[2]

The *McNabb-Mallory* rule was not applied with enthusiasm by all of the federal courts,[3] and it became the subject of much criticism in Congress.[4] Finally, in 1968, Congress took aim at the *McNabb-Mallory* rule, along with other concerns, when it enacted the Omnibus Crime Control and Safe Streets Act of 1968, 18 USC 3501.[5] The act

[2] For a general discussion of the *McNabb-Mallory* rule, see Keene, *The ill-advised state court revival of the* McNabb-Mallory *rule,* 72 J Crim L & Criminology 204 (1981); note, *18 USC § 3501 and the admissibility of confessions obtained during unnecessary prearraignment delay,* 84 Mich L R 1731 (1986); 1 LaFave & Israel, Criminal Procedure, § 6.3, p 451.

[3] See, e.g., *Ruhl v United States,* 148 F2d 173, 175 (CA 10, 1945); *United States v Haupt,* 136 F2d 661, 671 (CA 7, 1943).

[4] See 1 Wright, Federal Practice and Procedure, § 72, p 63.

[5] Section 3501 of the act provides:

    (a) In any criminal prosecution brought by the United States or by the District of Columbia, a confession, as defined in subsection (e) hereof, shall be admissible in evidence if it is voluntarily given. Before such confession is received in evidence, the trial judge shall, out of the presence of the jury, determine any issue as to voluntariness. If the trial judge determines that the confession was voluntarily made it shall be

reflected a strong reaction on the part of Congress
to what it regarded as illogical and unrealistic
court decisions resulting from the application" of

admitted in evidence and the trial judge shall permit the jury
to hear relevant evidence on the issue of voluntariness and
shall instruct the jury to give such weight to the confession as
the jury feels it deserves under all the circumstances.

(b) The trial judge in determining the issue of voluntariness
shall take into consideration all the circumstances surrounding
the giving of the confession, including (1) the time elapsing
between arrest and arraignment of the defendant making the
confession, if it was made after arrest and before arraignment,
(2) whether such defendant knew the nature of the offense with
which he was charged or of which he was suspected at the time
of making the confession, (3) whether or not such defendant
was advised or knew that he was not required to make any
statement and that any such statement could be used against
him, (4) whether or not such defendant had been advised prior
to questioning of his right to the assistance of counsel; and (5)
whether or not such defendant was without the assistance of
counsel when questioned and when giving such confession.

The presence or absence of any of the above-mentioned
factors to be taken into consideration by the judge need not be
conclusive on the issue of voluntariness of the confession.

(c) In any criminal prosecution by the United States or by the
District of Columbia, a confession made or given by a person
who is a defendant therein, while such person was under arrest
or other detention in the custody of any law-enforcement officer
or law-enforcement agency, shall not be inadmissible solely
because of delay in bringing such person before a magistrate or
other officer empowered to commit persons charged with offen-
ses against the laws of the United States or of the District of
Columbia if such confession is found by the trial judge to have
been made voluntarily and if the weight to be given the
confession is left to the jury and if such confession was made or
given by such person within six hours immediately following
his arrest or other detention: *Provided,* That the time limita-
tion contained in this subsection shall not apply in any case in
which the delay in bringing such person before such magistrate
or other officer beyond such six-hour period is found by the
trial judge to be reasonable considering the means of transpor-
tation and the distance to be traveled to the nearest available
such magistrate or other officer.

(d) Nothing contained in this section shall bar the admission
in evidence of any confession made or given voluntarily by any
person to any other person without interrogation by anyone, or
at any time at which the person who made or gave such
confession was not under arrest or other detention. [Emphasis
in original.]

the *McNabb-Mallory* rule.[6] 90th Cong (2d Sess),
1968 US Code Cong & Admin News 2124.

Since then, most federal courts have interpreted
§ 3501 as allowing the admission of a voluntary
confession even though it is given during a period
of prearraignment delay—in effect, overruling
*McNabb-Mallory.* A majority of federal courts
have followed the route taken by the Ninth Circuit
in *United States v Halbert,* 436 F2d 1226, 1231
(CA 9, 1970), wherein it explained,

> [I]t is obvious that the prime purpose of Con-
> gress in the enaction of § 3501 was to ameliorate
> the effect of the decision in *Mallory v United
> States* (1957), 354 US 449; 77 S Ct 1356; 1 L Ed 2d
> 1479, to remove delay alone as a cause for reject-
> ing admission into evidence of a confession and to
> make the voluntary character of the confession,
> the real test of its admissibility.[7]

The *Halbert* court quoted from the legislative
history of § 3501, which reflected overwhelming
congressional opinion that the admissibility of a
confession should turn on its voluntariness:

> "This title would restore the test for the admissi-

---

[6] For instance, in *Alston v United States,* 121 US App DC 66; 348
F2d 72 (1965), the court held that a five-minute delay constituted an
unnecessary delay; in *Spriggs v United States,* 118 US App DC 248;
335 F2d 283 (1964), a thirty-minute delay was held to require suppres-
sion.

[7] See also *United States v Beltran,* 761 F2d 1 (CA 1, 1985); *United
States v Jackson,* 712 F2d 1283 (CA 8, 1983); *United States v Rubio,*
709 F2d 146 (CA 2, 1983); *United States v Manuel,* 706 F2d 908 (CA 9,
1983); *United States v Van Lufkins,* 676 F2d 1189 (CA 8, 1982);
*United States v Killian,* 639 F2d 206 (CA 5, 1981); *United States v
Gorel,* 622 F2d 100 (CA 5, 1980); *United States v Corral-Martinez,* 592
F2d 263 (CA 5, 1979); *United States v Gaines,* 555 F2d 618 (CA 7,
1977); *United States v Mayes,* 552 F2d 729 (CA 6, 1977); *United States
v Edwards,* 539 F2d 689 (CA 9, 1976), cert den 429 US 984 (1976);
*United States v Shoemaker,* 542 F2d 561 (CA 10, 1976), cert den 429
US 1004 (1976); *United States v Hathorn,* 451 F2d 1337 (CA 5, 1971);
*United States v Marrero,* 450 F2d 373 (CA 2, 1971), cert den 405 US
933 (1972).

bility of confessions in criminal cases to that time-tested and well-founded standard of voluntariness. It would avoid the inflexible rule of excluding such statements *solely* on technical grounds such as delay or failure to warn the accused as to his rights to silence or to counsel. We have not nullified, however, the rights of defendants to the safeguards of federal law or the Constitution. On the contrary, we have provided a more reasonable rule in that the judge shall consider all the defendant's rights (speedy arraignment, silence, counsel, knowledge of offense charged) and their possible violation in deciding as to the voluntariness of the confession and thus its admissibility."[8] [*Id.,* p 1236, n 6, quoting from 1968 US Code Cong & Admin News 2282.]

The *McNabb-Mallory* rule was formulated by the United States Supreme Court "[i]n the exercise of its supervisory authority over the administration of criminal justice in the federal courts . . . ." *McNabb, supra,* 318 US 341. Because it was not constitutionally mandated, the rule was never applicable to criminal proceedings in state courts.[9] However, as is true in Michigan,

---

[8] A minority of federal courts has held that subsection 3501(c) establishes a limited version of the *McNabb-Mallory* rule, permitting the suppression of otherwise voluntary confessions if made more than six hours after arrest and during an unnecessary delay in arraignment. See, e.g., *United States v Perez,* 733 F2d 1026 (CA 2, 1984); *United States v Fouche,* 776 F2d 1398 (CA 9, 1985); *United States v Khan,* 625 F Supp 868 (SD NY, 1986). For an annotation discussing federal cases dealing with the interpretation of § 3501, see 12 ALR Fed 377.

[9] In *Culombe v Connecticut,* 367 US 568, 600-601; 81 S Ct 1860; 6 L Ed 2d 1037 (1961), the Court observed:

The *McNabb* case was an innovation which derived from our concern and responsibility for fair modes of criminal proceeding in the federal courts. The States, in the large, have not adopted a similar exclusionary principle. And although we adhere unreservedly to *McNabb* for federal criminal cases, we have not extended its rule to state prosecutions as a requirement of the Fourteenth Amendment. [Citations omitted.]

most states require by statute that an arrested person must be arraigned "without unnecessary delay."[10] In interpreting such statutes, the "vast majority of state courts [like their federal counterparts] have rejected *McNabb-Mallory* outright, opting instead for a traditional due process voluntariness test of the admissibility of confessions." *Johnson v State,* 282 Md 314, 324; 384 A2d 709 (1978). Under the view adopted in most states, a confession obtained from a suspect in violation of his statutory right to prompt arraignment is not ipso facto inadmissible; rather, arraignment delay is taken into account as one relevant factor in evaluating the overall voluntariness of the confession.[11] See, for example, *State v Newnam,* 409 NW2d 79 (ND, 1987); *Ferry v State,* 453 NE2d 207 (Ind, 1983); *People v Goree,* 115 Ill App 3d 157; 70 Ill Dec 869; 450 NE2d 342 (1983); *People v Harris,* 28 Cal 3d 935; 171 Cal Rptr 679; 623 P2d 240 (1981); *State v Wiberg,* 296 NW2d 388 (Minn, 1980); *State v Wyman,* 97 Idaho 486; 547 P2d 531 (1976), overruled on other grounds *State v McCurdy,* 100 Idaho 683; 603 P2d 1017 (1979).[12]

See also *Stroble v California,* 343 US 181, 197; 72 S Ct 599; 96 L Ed 872 (1952). The statutory right to prompt arraignment without unnecessary delay should not be confused with the Fourth Amendment requirement of a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest without a warrant. *Gerstein v Pugh,* 420 US 103, 114; 95 S Ct 854; 43 L Ed 2d 54 (1975).

[10] For a comprehensive list of state statutes dealing with prearraignment delay, see 72 J Crim L & Criminology, n 2 *supra,* pp 209-210, ns 33-34.

[11] Anno: *Admissibility of confession or other statement made by defendant as affected by delay in arraignment—Modern state cases,* 28 ALR4th 1121, reviews the status of the *McNabb-Mallory* rule on a state-by-state basis. See also Weldele-Wade, *The* McNabb-Mallory *rule: Is the benefit worth the burden?,* 44 Mont L R 137 (1983).

[12] The reasoning underlying this approach has been explained as follows:

Rules of evidence should aid the court in correctly determin-

By contrast, in *People v Hamilton,* 359 Mich 410; 102 NW2d 738 (1960), Michigan, in 1960, became the first state to adopt the *McNabb-Mallory* rule.[13]

However, a split on the issue appeared within the Court in *People v Ubbes,* 374 Mich 571; 132 NW2d 669 (1965). Although the Court unanimously condemned the use at trial of confessions coerced through delays in arraignments, only half of the *Ubbes* Court would have held the confession, obtained after a delay of sixteen and one-half hours, inadmissible on the ground that "confessions however obtained during such periods of illegal detention must be excluded from evidence in courts of law." *Id.,* pp 586-587 (opinion of SOURIS, J.). The remainder of the Court, while noting that "[m]ere lapse of time, without arraignment, *can* render a confession obtained during such detention illegally obtained and hence inadmissible," *id.,* p 577 (emphasis in original), concluded nonetheless that the proper question is one, not of delay, but of coercion:

Time of detention alone, without arraignment, is

---

ing the facts in the case. . . . Excluding a confession because made while the maker was in custody and not promptly taken before a magistrate would greatly hinder rather than aid the court in correctly determining the facts, for there is nothing about being in custody in the absence of coercion which would show any reason or motive for fabricating a confession. [*State v Gardner,* 119 Utah 579, 588-589; 230 P2d 559 (1951).]

[13] The *Hamilton* Court held:

[A]n unnecessary and so unlawful delay of compliance with [the statute], when done for prolonged interrogatory purposes and without proven justification of the delay, renders involuntary and so inadmissible whatever confessional admissions the detained person may have made while so unlawfully detained. [*Hamilton, supra,* p 417. See also *People v McCager,* 367 Mich 116; 116 NW2d 205 (1962), and *People v Walker,* 371 Mich 599; 124 NW2d 761 (1963).]

not the test. If for the same 16½ hours defendant had been held without appearance before a magistrate and he had been "sweated," i.e., questioned unremittingly for the purpose of extracting a confession, we would not hesitate to strike down the practice and withhold from jury consideration his alleged confession. Here the totality of the circumstance indicates bona fide questioning to determine the immediate issue of release, or complaint, and complaint for what offense. We believe this is the meaning of the rule announced in *People v Hamilton,* 359 Mich 410. [*Id.,* p 576 (opinion of O'HARA, J.).]

In *People v Farmer,* 380 Mich 198; 156 NW2d 504 (1968), this Court focused on a lack of coercive circumstances in holding that a seventy-two hour prearraignment delay did not render a confession inadmissible.

Then, in *People v White,* 392 Mich 404; 221 NW2d 357 (1974), cert den 420 US 912 (1975), this Court unanimously ruled that a confession was admissible even though it had been obtained after a thirty-four hour prearraignment delay. The Court found that the most damaging statement made by the defendant was "not the product of a police interrogation," and held the exclusionary rule to be applicable "[o]nly when the delay has been employed as a tool to extract a statement . . . ." *Id.,* p 424. The *White* Court took note of the fact that the defendant had been repeatedly warned of his constitutional rights and also had an opportunity to consult with his lawyer.

Thereafter, at least for a period of time, the Court of Appeals interpreted *Hamilton* and *White* to mean that "the question is not one of delay, but of whether the statement was voluntary or coerced." *People v Johnson,* 85 Mich App 247, 251; 271 NW2d 177 (1978). See also *People v*

*Wallach,* 110 Mich App 37, 59; 312 NW2d 387 (1981), vacated and remanded on other grounds 417 Mich 937 (1983); *People v Dean,* 110 Mich App 751, 755; 313 NW2d 100 (1981).

However, in the 1984 decision of *People v Bladel (After Remand),* 421 Mich 39; 365 NW2d 56 (1984), aff'd sub nom *Michigan v Jackson,* 475 US 625; 106 S Ct 1404; 89 L Ed 2d 631 (1986), this Court divided four to three in finding inadmissible several incriminating statements obtained by police during a twenty-six and one-half hour prearraignment delay. The majority dismissed with a footnote the argument that admissibility should turn on voluntariness or coercion:

> Plaintiff suggests that even if an unnecessary prearraignment delay occurred, the ultimate test for purposes of the exclusionary rule is whether the statement obtained was voluntary or coerced. See, e.g., *People v Wallach,* 110 Mich App 37, 59, n 5; 312 NW2d 387 (1981), vacated and remanded on other grounds 417 Mich 937; 331 NW2d 730 (1983); *People v Antonio Johnson,* 85 Mich App 247, 252-253; 271 NW2d 177 (1978). Although earlier decisions of this Court could be interpreted in this manner, see, e.g., *People v Farmer,* 380 Mich 198; 156 NW2d 504 (1968); *People v Ubbes,* 374 Mich 571; 132 NW2d 669 (1965); *People v Harper,* 365 Mich 494; 113 NW2d 808 (1962); *Hamilton, supra,* an examination of *White, supra,* 392 Mich 424-425, reveals that this Court now treats the question of prearraignment delay apart from the issue of voluntariness. If voluntariness were the only relevant inquiry, there would be no reason to analyze whether a prearraignment delay occurred and was used as a tool, since involuntary statements have always been held inadmissible regardless of when they are obtained. Prompt arraignment serves several important functions apart from preventing

improper custodial interrogations. [*Bladel, supra,* p 74, n 27.][14]

In another case, decided the same day, *People v Mallory,* 421 Mich 229; 365 NW2d 673 (1984), this Court expanded what it referred to as the "*White* exclusionary rule" beyond confessions to include physical evidence. The Court said, "If the physical evidence would not have been discovered but for the exploitation by the police of the illegal prearraignment delay, suppression is required." *Mallory, supra,* p 240. It added this caveat:

Obviously, not all evidence acquired directly or indirectly from a detainee during a statutorily unlawful detention will be procured by exploiting that detention, e.g., a statement volunteered absent police prompting or questioning, *White, supra,* pp 424-425, a *voluntary* statement made shortly after a lawful arrest, *People v Stinson,* 113 Mich App 719, 730-731; 318 NW2d 513 (1982);

[14] Three of the justices (RYAN, BRICKLEY, and BOYLE) dissented from this portion of the *Bladel* decision:

In my judgment, it is mere appellate speculation to conclude that the failure to arraign defendant Jackson during the morning of August 1 was "unnecessary prearraignment delay and that the delay was employed as a tool to extract these statements." That conclusion carries with it the implicit charge that the Livonia police contrived to lawlessly delay the defendant's arraignment on the mere pretext of completing unnecessary "paperwork," but for the actual purpose of extracting more confessions from him knowing that procedure to be improper. In my judgment, that conclusion is unsupported by the record.

* * *

It is equally plausible, on the record before us, that the officers honestly believed that they were insufficiently prepared to request and obtain a warrant in this major "murder for hire" case until the statutorily required warrant request was properly completed and approved, the previously scheduled polygraph examination was completed, and the defendant was afforded the opportunity to reconcile, if he wished to, the conflicts it revealed. See *United States v Lovasco,* 431 US 783, 791; 97 S Ct 2044; 52 L Ed 2d 752 (1977) . . . . [*Id.,* pp 75-76.]

*People v Ricky Smith,* 85 Mich App 32, 46-47; 270 NW2d 697 (1978); *People v William Turner,* 26 Mich App 632, 638-639; 182 NW2d 781 (1970) . . . or any evidence obtained by means sufficiently distinguishable to be purged of the taint of the unlawful detention. The exclusionary rule will not bar the admission at trial of evidence which has been acquired absent exploitation of a statutorily unlawful detention. [*Id.,* p 241. Emphasis supplied.]

Perhaps it is not surprising then that the Michigan version of the *McNabb-Mallory* rule,[15] sometimes referred to as the "causation form," has been described as a "schizophrenic rule," i.e., "[o]n the one hand, an exclusionary rule based solely on delay is adopted, while on the other exclusion applies only when the defendant proves a causal connection between the delay and the challenged confession." Keene, *The ill-advised state court revival of the* McNabb-Mallory *rule,* 72 J Crim L & Criminology 204, 212 (1981).[16] Beginning with the *Hamilton* decision, a dichotomy has been constructed which cannot be fully harmonized—a confession is inadmissible if involuntary, but even if voluntary, a court must exclude it if it finds a causal nexus between a delay and the confession. As this Court recognized in *Bladel, supra,* the

[15] Only half a dozen states have adopted the *McNabb-Mallory* rule, some utilizing a rule of suppression which requires only that the defendant show a violation per se of the prompt arraignment statute or court rule. *Commonwealth v Davenport,* 471 Pa 278; 370 A2d 301 (1977); *Johnson v State,* 282 Md 314; 384 A2d 709 (1978). Several other states require a showing of a causal connection between the illegal delay and the challenged confession. *Phillips v State,* 29 Wis 2d 521; 139 NW2d 41 (1966); *State v Richardson,* 295 NC 309; 245 SE2d 754 (1978); *People v Hamilton, supra.* Yet other states employ a variation of the *McNabb-Mallory* rule which evaluates the "reasonableness" of the delay. *Webster v State,* 59 Del 54; 213 A2d 298 (1965).

[16] A similar point of view is espoused in the discussion regarding the *McNabb-Mallory* rule in 44 Mont L R, n 11 *supra.*

causal nexus standard has generated confusion, leading to contradictory appellate decisions.[17]

In light of the history of *McNabb-Mallory* and recent developments in constitutional law, it has been suggested by one court that application today of the *McNabb-Mallory* rule has the effect of "burning the barn to get rid of the mice . . . ." *Shope v State,* 41 Md App 161, 171; 396 A2d 282 (1979). Concerns which troubled the *McNabb* Court in 1943 have been addressed and remedied for the most part by subsequent changes in constitutional doctrines.[18] For example, *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966), reduced the significance of one basis for the *McNabb* decision—that a delay in an initial hearing represented a potential delay in informing a suspect of his rights by a judicial officer.[19] Nowadays the fact of police custody triggers a number of rights, including the right to counsel, which the police dare not ignore. *Miranda v Arizona, supra; Edwards v Arizona,* 451 US 477; 101 S Ct 1880; 68 L Ed 2d 378 (1981); *Michigan v Jackson, supra.* The Supreme Court has, through the Fourth

[17] Variations of the *McNabb-Mallory* rule which have been adopted by other state courts (see note 15) are equally deficient when put to the test of practical application. Enforcing the rule by means of a standard of "unnecessary" or "unreasonable" delay causes confusion for courts and law enforcement officials alike. These criteria are not capable of precise definition, as illustrated by *Mallory v United States, supra,* pp 454-455, wherein the Court held that arraignment should take place "as quickly as possible" yet also stated that "[c]ircumstances may justify a brief delay between arrest and arraignment . . . ." Time-based standards arbitrarily dictate the behavior of the law enforcement community without regard to reasons for delay. See *Johnson v State, supra,* p 333 (dissent of Orth, J.).

[18] See, generally, 72 J Crim L & Criminology, n 2 *supra,* pp 226-232; 1 LaFave & Israel, n 2 *supra,* § 6.3, p 457.

[19] Indeed, some courts have held that a valid waiver of a suspect's *Miranda* rights also constitutes a waiver of the right to arraignment without unnecessary delay. *United States v Barlow,* 693 F2d 954 (CA 6, 1982), cert den 461 US 945 (1983); *United States v Mandley,* 502 F2d 1103 (CA 9, 1974); *Bliss v United States,* 445 A2d 625 (DC App, 1982), and 452 A2d 172 (DC App, 1982), cert den 459 US 1117 (1983).

Amendment, restricted pickup for questioning. For instance, in *Brown v Illinois,* 422 US 590; 95 S Ct 2254; 45 L Ed 2d 416 (1975), the Court held that despite the giving of warnings required by the *Miranda* decision, the Fourth and Fourteenth Amendments require the exclusion from evidence of statements obtained as the fruit of an illegal arrest. In *Dunaway v New York,* 442 US 200; 99 S Ct 2248; 60 L Ed 2d 824 (1979), custodial questioning on less than probable cause was held to be violative of the Fourth Amendment. Moreover, although a voluntary statement obtained in violation of *Miranda* is admissible for impeachment purposes, *Harris v New York,* 401 US 222, 224-226; 91 S Ct 643; 28 L Ed 2d 1 (1971), the use of an involuntary statement in a criminal trial, either for impeachment purposes or in the prosecution's case in chief, violates due process. *Mincey v Arizona,* 437 US 385; 98 S Ct 2408; 57 L Ed 2d 290 (1978); *Blackburn v Alabama,* 361 US 199; 80 S Ct 274; 4 L Ed 2d 242 (1960).[20]

Such constitutional developments have substantially eliminated the reasons for the *McNabb-Mallory* rule, thereby diminishing its significance and limiting its application to a small class of defendants:

> *McNabb-Mallory* affects only voluntary confessions by persons arrested upon probable cause who knowingly and voluntarily waive their rights to silence and counsel after being warned of the consequences of such a waiver.
>
> *     *     *
>
> The only remaining target for the rule today is prearraignment delay by itself, unrelated to consti-

---

[20] Moreover, a writ of habeas corpus to inquire into the cause of detention, as well as an order to show cause why the writ should not issue, may be brought on behalf of a person imprisoned "under any pretense whatsoever." MCL 600.4307; MSA 27A.4307.

tutional rights of an arrestee or the validity of his confession. [72 J Crim L & Criminology, *supra,* pp 229, 231.][21]

As noted above, the prompt-arraignment requirement was never elevated by the United States Supreme Court to the level of a constitutional right.[22] The automatic application today of the *McNabb-Mallory* exclusionary rule to statements voluntarily given during a prearraignment delay would exact a heavy toll on our system of justice.

The raison d'être of the exclusionary rule is the deterrence of official misconduct. *United States v Janis,* 428 US 433, 458-459, n 35; 96 S Ct 3021; 49 L Ed 2d 1046 (1976); *Mapp v Ohio,* 367 US 643, 656; 81 S Ct 1684; 6 L Ed 2d 1081 (1961).[23] However, the United States Supreme Court recently observed that

"[j]urists and scholars uniformly have recognized

---

[21] One of the ironies of *McNabb-Mallory* is that a rule premised upon a fear of "secret interrogation" and a solicitude for the inherent coercion of custodial interrogation, *McNabb, supra,* 318 US 344, provides no protection at all for the defendant who is properly arrested, and promptly arraigned, but who cannot make bail. See 1 LaFave & Israel, n 2 *supra,* p 452. And as Justice BOYLE notes in her dissent in *People v Mallory, supra,* p 257, whether a given defendant "would have been able to make bail and what it would have been are matters of pure supposition . . . ."

[22] While this Court "is certainly free to interpret the Michigan Constitution to require a higher standard for the protection of our citizens than that which the United States Constitution grants to citizens by virtue of its commands," *Mallory, supra,* p 256 (dissent of BOYLE, J.), and appears to have done so in the past, see, e.g., *Hamilton, supra,* p 411, and *Mallory, supra,* p 239, our decision today would be inconsistent if we on the one hand read the relevant provisions of the Michigan Constitution (Const 1963, art 1, § 17) to require enforcement of a "right" to immediate arraignment and on the other hand relegated prearraignment delay to its status as one factor to be considered in determining the voluntariness of a confession. We therefore do not give constitutional import to the statutory mandate of arraignment "without unnecessary delay."

[23] The effectiveness of the exclusionary rule has been the subject of debate since its inception. See, e.g., *Bivens v Six Unknown Named Agents,* 403 US 388, 416; 91 S Ct 1999; 29 L Ed 2d 619 (1971) (dissent of Burger, C.J.).

that the exclusionary rule imposes a substantial cost on the societal interest in law enforcement by its proscription of what concededly is relevant evidence." *United States v Janis,* 428 US 433, 448-449 (1976). See also *United States v Havens,* 446 US 620, 627 [100 S Ct 1912; 64 L Ed 2d 559] (1980); *United States v Calandra,* 414 US 338 [94 S Ct 613; 38 L Ed 2d 561] (1974). . . .

We have previously cautioned against expanding "currently applicable exclusionary rules by erecting additional barriers to placing truthful and probative evidence before state juries . . . ." *Lego v Twomey,* 404 US 477, 488-489 [92 S Ct 619; 30 L Ed 2d 618] (1972). We abide by that counsel now. "[T]he central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence," *Delaware v Van Arsdall,* 475 US 673, 681 [106 S Ct 1431, 1436; 89 L Ed 2d 674] (1986), and while we have previously held that exclusion of evidence may be necessary to protect constitutional guarantees, both the necessity for the collateral inquiry and the exclusion of evidence deflect a criminal trial from its basic purpose. [*Colorado v Connelly,* 479 US 157, 166; 107 S Ct 515; 93 L Ed 2d 473 (1986).]

We note that Michigan's prearraignment delay statutes have never included a directive by the Legislature that failure to comply will render inadmissible a confession voluntarily given. Of course, the Legislature could provide sanctions for violations, and it could define more specifically the parameters of "unnecessary delay."

In accordance with the approach taken by the federal courts and a majority of the states, we believe "unnecessary delay" in arraignment is only one of the factors that should be considered in evaluating the voluntariness of a confession. The test of voluntariness should be whether, considering the totality of all the surrounding circum-

stances, the confession is "the product of an essentially free and unconstrained choice by its maker," or whether the accused's "will has been overborne and his capacity for self-determination critically impaired . . . ." *Culombe, supra,* 367 US 602. The line of demarcation "is that at which governing self-direction is lost and compulsion, of whatever nature or however infused, propels or helps to propel the confession." *Id.*

In determining whether a statement is voluntary, the trial court should consider, among other things, the following factors: the age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured, intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse. See *Culombe, supra; United States ex rel Mattox v Scott,* 372 F Supp 304, 309-310 (ND Ill, 1974), aff'd in part and rev'd in part 507 F2d 919 (CA 7, 1974). See also *Schneckloth v Bustamonte,* 412 US 218; 93 S Ct 2041; 36 L Ed 2d 854 (1973).

The absence or presence of any one of these factors is not necessarily conclusive on the issue of voluntariness. The ultimate test of admissibility is whether the totality of the circumstances surrounding the making of the confession indicates that it was freely and voluntarily made. Unnecessary delay is one factor to consider in reaching

this conclusion, the focus being not just on the length of delay, but rather on what occurred during the delay and its effect on the accused.

In relegating prearraignment delay to its status as one of several factors to be considered in judging the voluntariness of a confession, we do not condone the failure of the police to comply with the statutes. An arrested suspect should not be subjected to prolonged, unexplained delay prior to arraignment; and such delay should be a signal to the trial court that the voluntariness of a confession obtained during this period may have been impaired. However, we hold that an otherwise competent confession should not be excluded solely because of a delay in arraignment.

We move now to the application of these principles to the cases at hand.

II

At issue in *People v Dean* is the admissibility of a confession which provided a basis for the defendant's 1980 conviction by a jury of three counts of first-degree murder and possession of a firearm during the commission of a felony.

On November 20, 1979, the police were called to a Detroit address and discovered the bodies of two men and one woman. All three victims had been bound and shot in the head. There were no eyewitnesses to the killings. Information gathered during the next ten days, however, implicated the defendant.

A child of one of the victims described a man fitting defendant's description who had been present in the home when she went to bed on the evening of the murders. A similar description was given by an individual who was walking by the house when the shots were fired. He observed a

man with defendant's characteristics emerge from the residence and drive off in an orange Cougar automobile. A third witness identified the defendant from photographs as being present in the house with the three victims earlier in the evening before the shootings occurred. A fourth individual, the defendant's neighbor, identified the defendant by name, confirmed that the defendant frequently drove his girl friend's orange Cougar, and added that he had introduced the defendant to one of the victims a few days previously for the purpose of a narcotics transaction.

At 1:00 P.M. on November 30, 1979, the defendant was arrested without a warrant while driving an orange Cougar. He was advised of his rights through the use of a standard form. Defendant indicated that he understood each right by putting his initials and signature on the form. He never indicated that he did not wish to talk to police or that he wished to speak with an attorney. The defendant was then interrogated by an investigating officer for three or four hours. The questioning ceased while the police attempted to verify his exculpatory version of events. The defendant was then interviewed by another officer for approximately two hours.

On the following morning, defendant was re-advised of his *Miranda* rights and questioned until 1:00 P.M. The police then took defendant before a magistrate and obtained a "reverse writ," which purported to give the police until 2:00 P.M. the next day either to conclude the investigation or to release the defendant. Defendant was returned to the police station and advised again of his *Miranda* rights. He initialed and signed the rights form. Defendant was confronted with the fact that his statement was not consistent with that of a purported alibi witness. At 3:35 P.M., twenty-six

hours after his arrest, the defendant gave a signed confession. In the confession, defendant admitted binding and shooting the victims as a result of a dispute over the defendant's demand for a refund for some poor quality heroin sold to him by two of the victims.

Defendant was subsequently identified by witnesses at three separate corporeal line-ups held on the evening of December 1, 1979. On December 2, defendant was taken before a magistrate and arraigned.

A separate *Walker* hearing was conducted (*People v Walker* [*On Rehearing*], 374 Mich 331; 132 NW2d 87 [1965]). The lower court determined that the defendant's confession was voluntary and admissible in his trial. The Court of Appeals affirmed his conviction by a jury, stating, in pertinent part:

> [T]he sequence of events in this case indicates that defendant's statements were voluntarily given, without threats or other oppressive police behavior, and that the delay in arraignment was not used to extract a confession. [Unpublished memorandum opinion of the Court of Appeals on remand, decided January 17, 1986 (Docket No. 87267).]

Defendant admits in his argument to this Court that his confession was voluntarily made and was not the product of coercion during the prearraignment detention. Rather, he contends that his confession should be excluded under the Search and Seizure Clause, US Const, Am IV, and Const 1963, art 1, § 11, because the confession was the product of an unlawful detention. Relying on *People v Casey,* 411 Mich 179; 305 NW2d 247 (1981), defendant maintains:

> Quite simply, in this case the Detroit Police

illegally seized the Defendant's person (by the "reverse writ"), and as a direct result of this illegal seizure obtained incriminating evidence against the Defendant (his confession). This is a search and seizure case. It is not a case challenging the voluntariness of Defendant's confession.

In *People v Casey, supra,* this Court had occasion to review what had come to be known colloquially in Detroit as a "reverse writ."[24] In lieu of granting leave to appeal, this Court held that such a proceeding was a "nullity. Its constitutional and statutory bases cannot be examined for it has none." *Casey, supra,* p 181. The Court "held only that the reverse writ had no effect on the legality of the detention." *Mallory, supra,* p 252 (dissent of BOYLE, J.). The conviction in *Casey* was reversed because of an illegal arrest based on insufficient evidence, not because of the reverse-writ procedure. *Casey* merely held that the reverse writ could not be used to justify an otherwise illegal arrest and detention.

By contrast, the police in the instant case had probable cause to arrest the defendant. *People v Shabaz,* 424 Mich 42, 58; 378 NW2d 451 (1985); *People v Oliver,* 417 Mich 366, 374; 338 NW2d 167 (1983). The defendant had been identified as the last person seen with the victims. He matched the description of the suspect seen leaving the residence immediately after the shooting and driving off in an orange Cougar. Therefore, *Casey* is inapplicable to the present facts.

The inquiry must be whether, given the totality of the circumstances, the defendant's confession

[24] In *People v Johnson, supra,* p 250, n 5, the Court explained that a "reverse writ proceeding is informal and without any documentation. It is the local police method of seeking judicial approval for extended detention of an arrestee without benefit of a warrant."

was voluntarily given. This point has been conceded by the defendant and is supported by the evidence. Defendant, an individual whose prior record indicates an awareness of *Miranda* and a familiarity with police interrogation, was apprised of his rights at least twice and did not express an unwillingness to talk with the police. Upon an independent examination of the record, we do not find that the court's determination at the *Walker* hearing was clearly erroneous, *People v Hummel,* 19 Mich App 266, 270; 172 NW2d 550 (1969). We "give deference to the trial court's findings, especially where the demeanor of the witnesses is important, as where credibility is a major factor." *People v Terlisner,* 96 Mich App 423, 431; 292 NW2d 223 (1980); *People v White, supra,* p 425; *People v Robinson,* 386 Mich 551, 557; 194 NW2d 709 (1972). We therefore confirm the admissibility of defendant's confession and affirm his conviction.

III

Defendant Dwight Harrison appeals from his conviction, following a jury trial, of voluntary manslaughter, MCL 750.321; MSA 28.553.

On March 17, 1981, a witness observed a Cadillac automobile parked in front of her home in Inkster, Michigan, with two men inside. She later observed the decedent lying on the ground and the Cadillac driving off at a high rate of speed. The decedent eventually died from a gunshot wound apparently inflicted at the scene.

At 5:00 P.M. on April 29, 1981, defendant was arrested by the Detroit police while driving the decedent's car. The Inkster police were notified. Officer James Horne, a detective from Inkster in charge of the homicide case, came to Detroit. He advised defendant of his *Miranda* rights. Defen-

dant initialed and signed the rights form, and
Horne proceeded to question him. Defendant told
the detective he had purchased the Cadillac from
his employer and that his girl friend had a copy of
the receipt. At the conclusion of the interview, at
approximately 1:00 or 2:00 A.M. on April 30, 1981,
defendant was transported to the Inkster Police
Department where he was held for "investigation
of homicide."

At 10:30 A.M. on April 30, defendant was again
advised of his *Miranda* rights. He signed and
initialed the rights form and did not request an
attorney. Defendant was interviewed a second
time. His girl friend was contacted, but she was
unable to verify the defendant's original state-
ment. Defendant subsequently gave two separate
exculpatory statements. The interview ended at
1:20 P.M. Detective Horne suggested that defen-
dant take a polygraph examination because Horne
"didn't believe his statements." Defendant agreed.
Arrangements were made for a polygraph exami-
nation to be administered on the morning of Sat-
urday, May 2, 1981, the earliest available time.

No further contact was had with defendant until
he requested an audience with Detective Horne on
the following day, May 1. Defendant gave the
detective further information which purportedly
verified his exculpatory version of events. Mean-
while, the defendant's father had contacted an
attorney. During the evening of May 1, the attor-
ney went to the jail where he conferred with the
defendant. The defendant told his attorney about
the planned polygraph examination. After a brief
discussion, the attorney advised his client to take
the polygraph test.

On May 2, defendant was transported to the
Dearborn Police Department to take the polygraph
examination. Once again, he was advised of his

*Miranda* rights. Defendant's retained attorney was present in Dearborn prior to the polygraph examination and conferred with defendant. The attorney then left and returned after the examination was completed. Defendant failed the examination.

Defendant then gave a fourth explanation as to how he came to possess the victim's car. In this statement, the defendant said he was hitchhiking and was picked up by the decedent. The decedent parked the car and attempted to solicit sexual favors from the defendant. When defendant resisted, the decedent produced a pistol. According to defendant, the two men struggled over the pistol and the gun discharged during the struggle.

Defendant's attorney reviewed the written statement, and the defendant then signed it in his attorney's presence. Defendant was arraigned the next day, ninety-six hours after his arrest.

Prior to trial, a *Walker* hearing was held, and the trial court found that defendant's statements had been voluntarily made.

Defendant's jury conviction was initially reversed by the Court of Appeals due to instructional error. However, upon rehearing, the Court of Appeals vacated its earlier order and remanded the cause to the trial court to conduct an evidentiary hearing to determine the legality of defendant's four-day detention. On remand, the trial court found:

> The testimony presented clearly indicated that during the detainment each of the questionings of the defendant was preceded by *Miranda* warnings, and the testimony of the officers further indicated that defendant offered various statements to them which necessitated separate investigative pursuits.
>
> It is the determination of this court that the delay between defendant's arrest and arraign-

ments was not used to extract a confession and that the detainment was not illegal.

The Court of Appeals subsequently affirmed the trial court's findings.

As noted above, application of the prompt-arraignment statutes to a particular situation presupposes a lawful arrest. In the instant case defendant asserts that he was arrested for "investigation of homicide" without probable cause, that his arrest was illegal, and his statements, therefore, were inadmissible under the Fourth and Fourteenth Amendments.

The defendant was arrested by the Detroit police while driving the missing car of the crime victim. Within a few hours of his arrest, defendant was transferred to the custody of the Inkster police, whose sole interest in the case was the homicide. The testifying officers from the Inkster Police Department frankly admitted that they detained the defendant for "investigation of homicide" and for no other purpose.

However, the terminology used to effectuate an arrest is not determinative. See, e.g., *People v Hamoud,* 112 Mich App 348, 351; 315 NW2d 866 (1981); *People v Cook,* 153 Mich App 89, 91; 395 NW2d 16 (1986); *People v Simmons,* 134 Mich App 779, 783; 352 NW2d 275 (1984), lv den 421 Mich 860 (1985). An arresting officer's subjective characterization of the circumstances surrounding an arrest does not determine its legality. Rather, probable cause to justify an arrest has always been examined under a standard of objective reasonableness without regard to the underlying intent or motivation of the officers involved. *Michigan v DeFillippo,* 443 US 31, 37; 99 S Ct 2627; 61 L Ed 2d 343 (1979); *Beck v Ohio,* 379 US 89; 85 S Ct 223; 13 L Ed 2d 142 (1964); *Henry v United States,* 361

US 98; 80 S Ct 168; 4 L Ed 2d 134 (1959); *Brinegar v United States,* 338 US 160; 69 S Ct 1302; 93 L Ed 1879 (1949).

In the present case, the record indicates, and the defendant admits, that there was probable cause for the Detroit police to arrest defendant for receiving and concealing stolen property. He was driving the decedent's missing car, but the Cadillac bore license plates registered to a Plymouth owned by the defendant. When the Inkster police took custody of the defendant from the Detroit Police Department, they had probable cause to hold him and a second arrest was not required upon his transfer from the Detroit police. See *Garionis v Newton,* 827 F2d 306, 310 (CA 8, 1987).

Moreover, the record supports the fact that the Inkster police had probable cause to hold defendant for larceny of the decedent's automobile. Thus, the defendant was arrested for a cognizable offense, not merely for "investigation of murder."[25]

The question remains whether defendant's statements were the involuntary products of his prearraignment detention.

Ninety-six hours elapsed between defendant's arrest and his arraignment. However, "[d]elay does not mean mere passage of time; it means passage of time during which that which should and could be done is not done." *Metoyer v United States,* 102 US App DC 62, 65; 250 F2d 30 (1957).

Given defendant's association with the missing car of the crime victim and the fact that the car was observed at the scene of the murder, we begin with the premise that the Inkster police were entitled to question the defendant about the murder of the decedent. As explained by a federal

---

[25] Of course, we do not address the civil liability implications which might be raised by a prolonged detention. See, e.g., *Trejo v Perez,* 693 F2d 482 (CA 5, 1982).

court in *Heideman v United States,* 104 US App
DC 128, 130-131; 259 F2d 943 (1958):

> At the outset, the police, assuming they have
> probable cause for arrest, are entitled to ask the
> arrested suspect what he knows about a crime. If
> he denies knowledge, they are entitled to state to
> him what evidence they have and ask whether he
> cares to comment upon it. A strong circumstantial
> case which would satisfy the U.S. Commissioner,
> prima facie, might well be explained away by a
> suspect who knew what information the police
> relied on—hence leading to no charge being made.
> If the suspect continues to deny knowledge, the
> police are entitled to conclude the interview by
> saying, in effect, "Do you have anything further to
> tell us, or do you just want to let it stand the way
> it is?" . . . Such questions as these the police may
> ask—indeed *should* ask; it is only when the ques-
> tioning crosses into what can be termed "grilling,"
> or is continued beyond the brief period allowed,
> that the resulting confession may be held inadmis-
> sible.

In the instant case, the Inkster police asked the
defendant if he knew anything about the homicide.
He quickly offered an exculpatory statement. The
police immediately checked out the defendant's
version of events by talking to his girl friend and
found that not only could it not be verified, but
that probably it was not true. The defendant then
gave two differing exculpatory statements. Suspi-
cion escalated to the point that the police, the
defendant, and his attorney agreed to a polygraph
examination. Defendant failed the polygraph ex-
amination, leading to the confession which became
the grounds for securing a warrant.

The ninety-six hour time period which elapsed
between defendant's arrest and his arraignment
may be accounted for by the defendant's progres-

sion through four different explanations as to how
he came to possess the decedent's automobile. The
police correspondingly attempted to verify each
statement—an entirely appropriate course of con-
duct.

There is not the slightest evidence that the
defendant's confession was involuntarily extracted
by the police. The defendant was apprised of his
rights on at least three occasions and spoke will-
ingly with the police after waiving his rights. He
was not subjected to continuous interrogation or to
intimidating police misconduct. There is no evi-
dence of coercion which would have overwhelmed
the defendant's free will. Indeed, during the period
of his detention and prior to giving his incriminat-
ing statement, defendant conferred with an attor-
ney retained by his family. His attorney reviewed
the statement, and the defendant then signed it in
his attorney's presence. The defendant, who agreed
following consultation with his attorney to take a
polygraph examination, implicated himself in the
homicide immediately after learning of the unsat-
isfactory results of the examination. We conclude
that defendant's statements were the products of a
voluntary decision based not only on a knowledge
of his constitutional rights, but also on the results
of the polygraph examination. We therefore up-
hold the admissibility of defendant's statements at
trial and affirm his conviction.[26]

IV

Defendant Giovani Cipriano was convicted by a
jury in the Otsego Circuit Court of two counts of
first-degree murder.

[26] Defendant's claim of ineffective assistance of counsel is not prop-
erly before this Court. *People v Ginther,* 390 Mich 436, 443-444; 212
NW2d 922 (1973).

Defendant was tried for the shooting deaths of Robert Ellis and Doris Haskell. Defendant had lived with the decedents for some months in Detroit prior to moving to the Gaylord area. The trio then moved to a house in the country outside of Gaylord. The murders occurred at the house a few weeks after the move.

The landlady, who lived next door, testified that during the early afternoon of May 7, 1980, she heard what sounded like firecrackers. Moments later, Doris Haskell ran from her house to the landlady's house and told the landlady that John was shooting Bob. Haskell then returned to the house. The police were called. When they arrived, defendant was apprehended fleeing from the back door. The bodies of Ellis and Haskell were found lying together on the kitchen floor.

Defendant was arraigned two days later. In the interim, defendant was interviewed several times and gave several statements. Two of these statements were taped and introduced into evidence at trial, and a third statement, which consisted of the defendant's conversation with another jail inmate over a period of several days, was also entered into evidence.

On the day of his arrest, defendant identified himself as "John Dale." Defendant was read his *Miranda* rights, but did not request an attorney and was eager to talk to the police. Defendant told the police that a person named "Rick" entered the premises looking for drugs and shot the victims, and that defendant was trying to chase him at the time he was apprehended by the police. The police terminated the interview in the evening against defendant's wishes. Defendant wanted to resume the questioning the next day. After the session ended, the police obtained three search warrants, one for the defendant's blood sample, one for

defendant's clothes, and one for the trunk of defendant's car.

On the next day, May 8, 1980, the police learned the defendant's real name, Giovani Cipriano, and conducted a forty-five minute interview with the defendant after advising him of his *Miranda* rights. He adhered to his story that he was chasing the killer when arrested. Cipriano was then taken to the scene of the crime, in order to provide support for his statement. Later that afternoon, defendant gave a taped statement in which he claimed that he killed Ellis in self-defense and admitted that he shot Haskell, but was not able to remember how or why. Defendant agreed to take a polygraph test.

On the third day, Thursday, May 9, the defendant was apprised of his rights and given a polygraph test. After the test, the police informed the defendant that he had not told the "complete" truth. *Miranda* warnings were repeated, and the defendant gave a second taped statement that was incriminating and was admitted into evidence against him. Defendant was arraigned on the afternoon of May 9, 1980, forty-six hours after his arrest.

Defendant challenged the admissibility of the statements made during the period of May 7 to May 9 on the ground that they were the product of an illegal prearraignment detention. A *Walker* hearing was held during the preliminary examination. The district court judge found all of the defendant's statements to be admissible. The defendant then filed a motion to suppress the statements in circuit court on the basis of the length of his detention before arraignment. Defense counsel did not challenge the voluntariness of the statements. After a hearing, the circuit court denied the defendant's motion to suppress his confessions.

Defendant's subsequent convictions were affirmed by the Court of Appeals.

Defendant continues to maintain that the prearraignment detention was used to extract his incriminating statements. Defendant also asserts, for the first time, that his statements were not voluntarily made. He cites the presence of Valium in his system at the time of his arrest, an alleged suicide attempt, the fact that he never saw a lawyer during the period of interrogation, and the prolonged detention as coercive factors which precluded the exercise of independent judgment in rendering his statements.

However, the record demonstrates that defendant's statements were voluntary. Defendant was given *Miranda* warnings five times between his arrest and his confession. He neither requested counsel nor refused at any time to speak with the investigating officers. On the contrary, after the initial questioning on May 7, the defendant asked the officers to return in order to "get this thing straightened out." He was, in short, a talkative suspect. The defendant was in telephone contact with a family member during his detention. He volunteered to take a polygraph test. The fact that the defendant confessed after he was told that he had failed the polygraph test does not vitiate the voluntariness otherwise shown by the record. See *Wyrick v Fields,* 459 US 42, 47; 103 S Ct 394; 74 L Ed 2d 214 (1982).

The blood sample taken from the defendant on the evening following his arrest indicated only a small amount of Valium in his system. The defendant did not complain of illness or discomfort, and he was described as relaxed and coherent during the questioning. While the blood sample was being taken at the hospital, defendant requested Valium

from the attending physician. The request was denied by the doctor, not the police. According to the doctor, the defendant showed no signs of drug withdrawal. Thus, defendant's assertion that the police withheld needed medication is without basis in the record.

On the second evening of defendant's detention, he slashed his wrists and was briefly hospitalized. This act, according to the defendant's fellow inmate, was an attempt at escape, not suicide.

Given the absence of any factors which would indicate a coercive atmosphere during the prearraignment delay, we conclude that defendant's statements were voluntarily made and were properly admitted at trial. Under the totality of the circumstances, we conclude that the prearraignment delay did not interfere with or critically impair the exercise of defendant's free will during that period.

V

Accordingly, for the reasons stated, the decision of the Court of Appeals in each of these cases is affirmed.

RILEY, C.J., and BRICKLEY and BOYLE, JJ., concurred with GRIFFIN, J.

CAVANAGH, J. (*dissenting*).

I

MCL 764.13; MSA 28.871(1) commands police officers who arrest a person without a warrant to take that person "without unnecessary delay" before a judicial officer, at which time a complaint shall be made stating the charges against the person arrested. In the vulgate of our profession,

this is called the prompt-arraignment statute.[1] The statute, first enacted as 1927 PA 175,[2] is not a departure from prior practice. It codifies a venerable common-law rule which has existed in England for centuries[3] and which is enforced by most of the fifty states.[4] In *Oxford v Berry,* 204 Mich 197, 212-213; 170 NW 83 (1918), this Court described the requirement of prompt arraignment as an "elementary" principle of common law:

> It is elementary that, even in criminal cases, when the officer has made the arrest it is his duty, as soon as possible, to bring the party before the court according to the import of the warrant; and if the officer be guilty of unnecessary delay in so doing, it is a breach of his duty; and his duty is the same whether the arrest was made with, or without process. He must take him before the court as soon as he reasonably can.

---

[1] MCL 764.13; MSA 28.871(1) provides:

> A peace officer who has arrested a person for an offense without a warrant shall without unnecessary delay take the person arrested before a magistrate of the judicial district in which the offense is charged to have been committed, and shall present to the magistrate a complaint stating the charge against the person arrested.

See also MCL 764.26, 780.581; MSA 28.885, 28.872(1), where the command is repeated as to felony arrests with warrants and arrests of misdemeanor offenders.

[2] Specifically, ch IV, § 13 of Act 175.

[3] In *Gerstein v Pugh,* 420 US 103, 114; 95 S Ct 854; 43 L Ed 2d 54 (1975), the Court noted:

> At common law it was customary, if not obligatory, for an arrested person to be brought before a justice of the peace shortly after arrest. 2 M Hale, Pleas of the Crown 77, 81, 95, 121 (1736); 2 W Hawkins, Pleas of the Crown 116-117 (4th ed, 1762).

See also *Gerstein* at 114-115, n 14.

[4] *McNabb v United States,* 318 US 332, 342, n 7; 63 S Ct 608; 87 L Ed 819 (1943), collected the prompt arraignment statutes of the states.

As the majority notes, in *People v Hamilton,* 359 Mich 410; 102 NW2d 738 (1960), this Court became the first state to adopt the rule of exclusion for violations of the prompt-arraignment statute which the United States Supreme Court promulgated in *McNabb v United States,* 318 US 332; 63 S Ct 608; 87 L Ed 819 (1943), and refined in *Mallory v United States,* 354 US 449; 77 S Ct 1356; 1 L Ed 2d 1479 (1957). In *People v White,* 392 Mich 404; 221 NW2d 357 (1974), cert den sub nom *Michigan v White,* 420 US 912 (1975), this Court clarified that not every confession or statement obtained during an unreasonable delay in violation of the statute is excluded:

> Only when the delay has been employed as a tool to extract a statement has an exclusionary rule been imposed under these sections. [392 Mich 424.]

In both *People v Bladel (After Remand),* 421 Mich 39, 73; 365 NW2d 56 (1984), aff'd sub nom *Michigan v Jackson,* 475 US 625; 106 S Ct 1404; 89 L Ed 2d 631 (1986), and *People v Mallory,* 421 Mich 229, 241-243; 365 NW2d 673 (1984), we found that several statements had been obtained through exploitation of an unreasonable delay and thus were inadmissible at trial. In *People v Mallory,* we explained:

> These statements are excluded, even if they were given voluntarily, because they might never have been made by the detainee but for the illegal prearraignment delay. [421 Mich 240.]

Court-imposed sanctions are useful to encourage police officers to respect the rights of citizens with whom they come in contact in the course of their profession. The common sanction imposed is exclusion of evidence obtained in violation of a defendant's right. When exclusion is appropriate, it is done not to allow a guilty person to go free, but

"to deter future unlawful police conduct . . . ."[5] Before adopting an exclusionary rule, a court must carefully consider the social cost of such a rule and balance it against the social cost of not enforcing the underlying protected interest, whether it be freedom from unlawful search, the right to counsel, the right against self-incrimination, or, as in the present cases, the right to be free from extended and unnecessary detention without a warrant.

In Michigan, we have already weighed these concerns and have determined that exclusion is appropriate where a confession or statement is obtained by the police by exploiting their violation of the prompt-arraignment statute. *People v Hamilton, People v Bladel,* and *People v Mallory, supra.* The majority has accepted the people's invitation to overrule *Hamilton* and its progeny. It rejects an exclusionary rule which is based solely on violations of the prompt-arraignment statute, no matter how long the delay. The majority instead limits its inquiry to whether the confession was voluntary. We do not join the majority for several reasons, the first of which is respect for the principles of stare decisis.

A

Adherence to sound judicial precedent gives continuity and predictability to the law. It assures that judicial decisions will be the result of reason rather than the whim of the judge before whom a case is tried. Only compelling reasons justify a court in disregarding longstanding precedent.[6] Our nearly thirty-year experience with *Hamilton* does

___

[5] *United States v Calandra,* 414 US 338, 347; 94 S Ct 613; 38 L Ed 2d 561 (1974).

[6] See, e.g., *Miller v Fenton,* 474 US 104, 115; 106 S Ct 445; 88 L Ed 2d 405 (1985).

not persuade us that holding the police to the requirements of the prompt-arraignment statute has "exact[ed] a heavy toll on our system of justice." *Ante,* p 332.

The three cases we decide today demonstrate the need for judicial firmness on this point. *Hamilton* was decided in 1960, and its rule has been reaffirmed in this Court several times since. Yet in all three cases before us, defendants were arrested without warrants and their arraignments were delayed for two days or more. While this Court is divided on whether *Hamilton* should survive today, we all agree that the police clearly violated the command of the prompt-arraignment statute.

In rejecting the *McNabb-Mallory* rule, on which *Hamilton* was founded, the majority asserts that the "rule was not applied with enthusiasm by all of the federal courts." *Ante,* p 320. In support of that assertion, however, it cites but two cases, both of which were decided more than ten years before *Mallory.* Only one, *United States v Haupt,* 136 F2d 661 (CA 7, 1943), expressed disagreement with *McNabb.*[7] The persuasiveness of such early criticism of a new rule dims with time. For example, *Weeks v United States,* 232 US 383, 392; 34 S Ct 341; 58 L Ed 652 (1914), a landmark decision, directed that all evidence seized in violation of the Fourth Amendment be excluded from evidence. Despite the initial reaction of some who saw the rule as saying that "[t]he criminal is to go free because the constable has blundered,"[8] the *Weeks*

[7] The *Haupt* court also noted that the prearraignment delay which resulted in the confession occurred prior to announcement of the *McNabb* decision. 136 F2d 668.

[8] *People v Defore,* 242 NY 13, 21; 150 NE 585 (1926). In *Defore,* Justice Cardozo observed that of the forty-five states which had considered *Weeks* (it was not binding on the states under the constitutional doctrine of that day), thirty-one states had rejected the opinion while only fourteen followed it.

rule of exclusion is now widely recognized as an effective deterrent of Fourth Amendment violations by the police.[9]

B

In the Omnibus Crime Control and Safe Streets Act of 1968, specifically 18 USC 3501(c), Congress modified[10] the *McNabb-Mallory* rule with the following language:

> [*A*] *confession* made or given by a person who is a defendant . . . *shall not be inadmissible* solely because of delay in bringing such person before a magistrate . . . if such confession is found by the trial judge to have been made voluntarily and if the weight to be given the confession is left to the jury and *if such confession was made or given by such person within six hours immediately follow-*

---

[9] In *Mapp v Ohio,* 367 US 643; 81 S Ct 1684; 6 L Ed 2d 1081 (1961), the Supreme Court held that the *Weeks* exclusionary rule was applicable to the states through the Fourteenth Amendment. The Court observed that prior to its holding, states which previously had not been bound to apply the *Weeks* rule and had been reluctant to do so, later adopted the rule voluntarily:

> While in 1949, prior to the *Wolf* [*v Colorado,* 338 US 25; 69 S Ct 1359; 93 L Ed 1782 (1949)] case, almost two-thirds of the States were opposed to the use of the exclusionary rule, now, despite the *Wolf* case, more than half of those since passing upon it, by their own legislative or judicial decision, have wholly or partly adopted or adhered to the *Weeks* rule. See *Elkins v United States,* 364 US 206, Appendix, pp 224-232 [80 S Ct 1437; 4 L Ed 2d 1669 (1960)]. Significantly, among those now following the rule is California, which, according to its highest court, was "compelled to reach that conclusion because other remedies have completely failed to secure compliance with the constitutional provisions . . . ." *People v Cahan,* 44 Cal 2d 434, 445; 282 P2d 905, 911 (1955). [367 US 651.]

[10] The federal statute was the result of the political process and twice was rejected by Congress. There were amendments offered on the floor substantially altering § 3501, and some were adopted immediately, thus resulting in inexact language. See, e.g., note, *18 USC § 3501 and the admissibility of confessions obtained during unnecessary prearraignment delay,* 84 Mich L R 1731, 1732, n 7 (1986); note, *Admissibility of confessions in the federal courts and the Hobbs bill,* 38 J Crim L & Criminology 136, 137 (1947).

*ing his arrest or other detention:* Provided, That the time limitation contained in this subsection shall not apply in any case in which the delay in bringing such person before such magistrate or other officer beyond such six-hour period is found by the trial judge to be reasonable . . . . [Emphasis added.]

It is not accurate to say that through § 3501(c) either Congress or most federal courts "in effect, overrul[ed] *McNabb-Mallory.*" (*Ante,* p 322.)[11] *McNabb-Mallory* is still alive in federal courts, despite the confusion surrounding the modifying language of § 3501(c).[12] Even an authority relied on by the majority concluded that § 3501(c) affects the *McNabb-Mallory* rule only for delays which last six hours or less:

> *Mallory* continues to govern the admissibility of confessions obtained more than six hours after arrest and, therefore, a post-sixth-hour confession will be inadmissible if it follows a period of unnecessary prearraignment delay. Section 3501 only prohibits the application of *Mallory's* exclusionary rule to confessions obtained within six hours of arrest.[13]

Similarly, we are not persuaded by the significance the majority places on § 3501(c):

---

[11] Of course, lower federal courts cannot overrule the United States Supreme Court.

[12] Compare, for example, *United States v Halbert,* 436 F2d 1226, 1232-1234 (CA 9, 1970), with *United States v Perez,* 733 F2d 1026, 1032-1033 (CA 2, 1984). Since § 3501(c) regulates only federal practice, we need not decide whether *Halbert* or *Perez* represents the better view of congressional intent in enacting 18 USC 3501(c). Suffice it to say that we would not adopt the standard within that provision for Michigan practice even if we understood it because we want the police to understand it as well.

[13] Note, *18 USC § 3501 and the admissibility of confessions,* n 10 *supra,* p 1734.

The act reflected a strong reaction on the part of Congress to what it regarded as "illogical and unrealistic court decisions resulting from the application" of the *McNabb-Mallory* rule. [*Ante,* pp 320-322.]

If § 3501(c) represented an adverse congressional reaction to *McNabb-Mallory,* it was only to the extent that even brief delays in arraignment resulted in exclusion of evidence. The majority presents examples of the "illogical and unrealistic court decisions" in two cases where a five-minute and a thirty-minute delay each were held to violate the prompt-arraignment statute. *Ante,* p 322, n 6. We agree that those two federal cases have gone to the extreme in enforcing *McNabb-Mallory* and that they should not be incorporated into Michigan jurisprudence. However, more instances of such rigid application of the rule are rare.

In Michigan, we have advised the police that they may take the time to "book" the defendant and briefly delay arraignment as circumstances may require in order to determine whether to release the defendant or make a complaint. *Hamilton,* 359 Mich 416-417; *Bladel,* 421 Mich 69-70. We have never held that the suspect must be brought to the judicial officer on a drop-everything-else basis.

c

The majority asserts that Michigan's prompt-arraignment statute is ambiguous and difficult to follow:

Enforcing the rule by means of a standard of "unnecessary" or "unreasonable" delay causes confusion for courts and law enforcement officials

alike. These criteria are not capable of precise definition . . . . [*Ante,* p 330, n 17.]

Even if we were to agree with the majority's criticism, we could not change the standard because we did not create it; it was given to us by the Legislature. Moreover, the phrase "without unnecessary delay" has credentials too impressive to be rejected as causing confusion or lacking precision. It is the language used in the Federal Rules of Criminal Procedure;[14] the phrase is also used in the Model Penal Code's Uniform Rules of Criminal Procedure;[15] it is likewise found in the ABA Standards for Criminal Justice;[16] and it is the language of the common law. By now, any police officer should comprehend within narrow limits what constitutes unnecessary delay.[17]

Citing *Culombe v Connecticut,* 367 US 568; 81 S

---

[14] An officer making an arrest under a warrant issued upon a complaint or any person making an arrest without a warrant shall take the arrested person without unnecessary delay before the nearest available federal magistrate . . . . [FR Crim P 5(a).]

[15] Rule 311 of the Uniform Rules of Criminal Procedure provides:

An arrested person who is not sooner released shall be brought before a [magistrate] without unnecessary delay. [10 ULA 62.]

[16] Unless the accused is released on citation or in some other lawful manner, the accused should be taken before a judicial officer without unnecessary delay. [2 ABA Standards for Criminal Justice (2d ed), Pretrial Release, 10-4.1, p 10-43.]

[17] In many areas of the law, both civil and criminal, courts adopt standards having no bright line, leaving the limits to be set case by case. That is the beauty of the common law and the reason it excels over the rigidity of code systems of jurisprudence. For example, 2 Restatement Contracts, 2d, §§ 205, 208, pp 99, 107, does not define good faith or unconscionable contract. Also, criminal sentences which shock the judicial conscience continue to be defined case by case. *People v Coles,* 417 Mich 523; 339 NW2d 440 (1983).

Ct 1860; 6 L Ed 2d 1037 (1961),[18] the majority
proposes a substitute criterion: whether the confes-
sion is voluntary in "the totality of all the sur-
rounding circumstances." (*Ante,* pp 333-334.) This
indeed is an amorphous standard, as acknowledged
in 3 Wigmore, Evidence (Chadbourn rev), § 826, p
348:

> Mr. Justice Frankfurter, in his extensive opinion
> in *Culombe v Connecticut,* sums up by pointing to
> the "ultimate test . . . established . . . in Anglo-
> American courts for two hundred years: the test of
> voluntariness."
>
> Of course, the learned Justice does not intend to
> suggest, nor is it true, that "voluntariness" in this
> context is either a simple idea or one capable of
> exact definition.

Wigmore then quotes from the American Law
Institute, Model Code of Pre-Arraignment Proce-
dure 166-167 (Tentative Draft No 1, 1966), p 349,
which also highlighted the confusion surrounding
a "voluntariness" standard:

> "To the extent 'voluntariness' has made a deter-
> mination of the state of an individual's will the
> crucial question, it has not assisted analysis. Ex-
> cept where a person is unconscious or drugged or
> otherwise lacks capacity for conscious choice, all
> incriminating statements—even if made under
> brutal treatment—are 'voluntary' in the sense of
> representing a choice between alternatives."

Likewise, in *Miller v Fenton,* 474 US 104, 116, n
4; 106 S Ct 445; 88 L Ed 2d 405 (1985), the
Supreme Court noted:

> The voluntariness rubric has been variously con-

---

[18] The majority derives this standard from the opinion of Justice
Frankfurter, in which only one other justice joined.

demned as "useless," . . . "perplexing," . . . and "legal 'double-talk . . . .' "

Voluntariness is not only a difficult standard to apply, it is a quality essential to every confession admitted in evidence. Nonetheless, the majority argues that the concerns which troubled the *Mc-Nabb* Court in 1943 have been addressed and remedied for the most part by subsequent changes in constitutional doctrine, beginning with *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966). *Ante,* p 330. However, even the *Miranda* Court clarified that the giving of the *Miranda* warnings does not excuse an unnecessary delay in arraignment:

> Our decision today does not indicate in any manner, of course, that [the requirement of prompt arraignment] can be disregarded. When federal officials arrest an individual, they must as always comply with the dictates of the congressional legislation and cases thereunder. [384 US 463, n 32.]

Thus, the command of prompt arraignment is not served sufficiently by the majority's limited inquiry regarding whether the prisoner acted voluntarily even though illegally detained. We discussed this point in *Bladel, supra,* 421 Mich 74, n 27:

> If voluntariness were the only relevant inquiry, there would be no reason to analyze whether a prearraignment delay occurred and was used as a tool, since involuntary statements have always been held inadmissible regardless of when they are obtained. Prompt arraignment serves several important functions apart from preventing improper custodial interrogations.

It is telling that in creating an exclusionary rule

for violations of other rights, the United States Supreme Court has distinguished voluntariness from the right allegedly violated. In *Taylor v Alabama,* 457 US 687; 102 S Ct 2664; 73 L Ed 2d 314 (1982), for instance, the Court excluded the petitioner's confession because it was the fruit of his illegal arrest. The Court explained why the confession was invalid notwithstanding the three *Miranda* warnings which the petitioner received prior to confessing:

> In *Brown* [v *Illinois,* 422 US 590; 95 S Ct 2254; 45 L Ed 2d 416 (1975)] and *Dunaway* [v *New York,* 442 US 200; 99 S Ct 2248; 60 L Ed 2d 824 (1979)], this Court firmly established that the fact that the confession may be "voluntary" for purposes of the Fifth Amendment, in the sense that *Miranda* warnings were given and understood, is not by itself sufficient to purge the taint of the illegal arrest. In this situation, a finding of "voluntariness" for purposes of the Fifth Amendment is merely a threshold requirement for Fourth Amendment analysis. The reason for this approach is clear: "[t]he exclusionary rule, . . . when utilized to effectuate the Fourth Amendment, serves interests and policies that are distinct from those it serves under the Fifth" Amendment. If *Miranda* warnings were viewed as a talisman that cured all Fourth Amendment violations, then the constitutional guarantee against unlawful searches and seizures would be reduced to a mere " 'form of words.' " [457 US 690. Citations omitted.]

We perceive no functional difference between suppressing a confession made during unlawful detention following an illegal arrest and suppressing a confession obtained during a detention made illegal because of unnecessary delay in arraignment.

The majority asserts that "the prompt-arraignment requirement was never elevated by the

United States Supreme Court to the level of a constitutional right." (*Ante,* p 332.) That Court has determined, however, that the right to prompt arraignment is significant enough to warrant an exclusionary rule to enforce it. Furthermore, the majority's substitute standard, voluntariness under the totality of the surrounding circumstances (with prearraignment delay being only one consideration), improperly equates the requirement of prompt arraignment with other factors which the Legislature has not seen fit to codify as a statutory right.

D

The majority contends that the *McNabb-Mallory* rule "provides no protection at all" for the defendant who was properly arrested and promptly arraigned, but who cannot post bail. *Ante,* p 332, n 21. In drawing such a conclusion, the majority overlooks at least three important purposes of prompt arraignment.

First, there is a vast difference between the temporary facilities of a police precinct where the suspect is kept prior to arraignment and the facilities of a county jail where the unbonded defendant resides after arraignment. The police station typically is ill-equipped to serve food, provide adequate sleeping facilities, or allow any movement outside the jail cell itself. A county jail, on the other hand, is designed for longer-term detention. It has adequate food and bedding facilities, and allows movement at least within the block of cells.[19]

Second, even if a defendant is unable to post bail, he will receive from a judicial officer an

---

[19] See the regulations implemented by the Department of Corrections, Bureau of Correctional Facilities, Jails, Lockups, and Security Camps, 1979 AC, R 791.501 *et seq.*

enumeration of his constitutional rights in clear and easily understandable language. He will be told the exact nature and details of the charges against him, and will have an opportunity to make a statement or explain his conduct in open court.[20] All of this will be done on the record by a judicial officer, rather than perfunctorily and perhaps incompletely by a police officer in the station house.

Finally, and most importantly, an attorney will be appointed for the defendant at or shortly after the arraignment. Delaying the arraignment necessarily delays the appointment of counsel. Once counsel is appointed, the defendant has a right not to be interrogated without notice of his counsel. *Massiah v United States,* 377 US 201, 206; 84 S Ct 1199; 12 L Ed 2d 246 (1964); *Brewer v Williams,* 430 US 387, 400-401; 97 S Ct 1232; 51 L Ed 2d 424 (1977).[21]

Having expressed our disagreement with the majority's abandonment of the *McNabb-Mallory* exclusionary rule, we now consider the three cases before us.

II

A

The majority sufficiently reviews the facts of each case, and we need not repeat them. In *People v Dean,* it appears that during the twenty-six hours from arrest to confession, defendant was

[20] See *People v Mallory,* 421 Mich 239. See also 2 ABA Standards for Criminal Justice (2d ed), Pretrial Release, 10-4.2, p 10-50.

[21] In *People v Green,* 405 Mich 273; 274 NW2d 448 (1979), the police interrogated the defendant without notifying his appointed counsel, and obtained a confession. The Court was divided in rationale with respect to whether exclusion was a proper remedy (no opinion bore more than two signatures), but was in total agreement that the prosecution acted improperly. Further, the case was decided under the Code of Professional Responsibility and not on the basis of the Sixth Amendment right to counsel.

interrogated on four separate occasions, totaling approximately fourteen hours. The defendant was detained under a "reverse writ" issued in the Recorder's Court. The prosecutor argues that the writ was necessary to further investigate the case. However, the reverse writ procedure does not negate or suspend the requirement of a prompt arraignment. In *People v Casey*, 411 Mich 179, 181-182; 305 NW2d 247 (1981), the Court held that a reverse writ proceeding has no validity:

> It is a nullity. Its constitutional and statutory bases cannot be examined for it has none.
>
> * * *
>
> The principles governing the detention of a citizen may be located in a host of constitutional, statutory, and judicial sources; whether a citizen is being legally or illegally held is a determination which must be made by reference to those principles. We today neither add to nor subtract from that body of law. A detention which is otherwise illegal is not cleansed of its illegality by the issuance of a reverse writ or by the pendency of such proceedings.

The statute provides that a police officer who arrests a person "without a warrant shall without unnecessary delay take the person arrested before a magistrate . . . and shall present to the magistrate a complaint stating the charge against the person arrested." MCL 764.13; MSA 28.871(1).

A court rule provides that at the arraignment on the complaint, the court shall advise the defendant that he is entitled to the assistance of an attorney and that if he is financially unable to provide an attorney and wants an attorney, the court will appoint one at public expense. MCR 6.101(C)(1); GCR 1963, 785.4.

Dean was in court during the reverse-writ pro-

ceeding. Thus, as required by the statute, the
police did take him before a magistrate without
unnecessary delay. They did not, however, as also
required by the statute, present to the magistrate
a complaint stating a charge against Dean.

Prior to obtaining the reverse writ—and, a few
hours later, a confession—the police had sufficient
circumstantial evidence to arraign Dean. It ap-
pears from the length of the delay that the police
sought to obtain something more concrete—Dean's
admission. Before the reverse-writ proceeding,
Dean had been identified as the last person seen
with the victims, and matched the description of
the person who was seen leaving the residence
immediately after the shootings and driving away
in an orange Cougar. Dean had admitted being
with the victims and to frequently driving his girl
friend's orange Cougar.

We have not been provided with a transcript of
the reverse-writ proceeding. It does not appear
whether the magistrate was made aware of the
evidence the police had already obtained or
whether there was any discussion of whether Dean
desired representation by counsel. If, when the
reverse writ was granted by the magistrate, the
gist of the *Miranda* warnings was not repeated,
what occurred in that proceeding may have led
Dean, contrary to the spirit of *Miranda,* to believe
that he was expected to coöperate with the police
during the additional time granted by the magis-
trate for further investigation.

B

Cipriano was subjected to multiple interroga-
tions on the day he was arrested and on two
succeeding days. Eight hours after Cipriano's ar-
rest, a magistrate opened court (located in the

same building as the jail) at 11:00 P.M. and issued
three search warrants. A transcript of the hearing
on the issuance of the search warrants established
that by that time the police had obtained ample
evidence, as the officer in charge conceded at the
preliminary examination, to charge Cipriano with
having murdered the victims. That officer testified
at the search warrant hearing that earlier in the
day, at 2:00 P.M., a woman arrived at the home of
neighbors and informed them that Cipriano had
just shot her husband. They overheard her tele-
phone the state police. They observed her return-
ing to a dwelling contrary to their advice. They
observed no one enter or leave the dwelling except
that Cipriano ran from the rear of the dwelling
when police officers arrived. He was immediately
apprehended. Both the husband and the wife had
been shot and killed. No one else was on the
premises. There was blood on Cipriano's right
pants leg. There was a cut on his right forearm.
On the basis of this evidence, the officer sought
and obtained from the magistrate search warrants
to obtain blood samples from Cipriano and at the
scene.

C.

In *Dean* and *Cipriano,* it appears, on the basis of
*proceedings in magistrate's courtrooms,* that the
police failed to comply with the requirements of
the statute and were delaying arraigning the de-
fendants before magistrates on complaints—when
the magistrates would have been obliged by the
court rule to advise the defendants of their rights
to counsel and to inquire whether they desired the
appointment of counsel if financially unable to
obtain counsel on their own.

In both *Dean* and *Cipriano,* the defendants

sought and obtained the appointment of counsel when they were eventually arraigned on complaints. Had this occurred at the reverse-writ proceeding in *Dean* or the search warrant proceeding in *Cipriano,* the police could not have initiated further interrogation of Dean or Cipriano. See *People v Paintman,* 412 Mich 518; 315 NW2d 418 (1982).

Statements obtained from Dean after his courtroom appearance during the reverse-writ proceeding and from Cipriano after the 11:00 P.M. search warrant proceeding should be suppressed because magistrates were available to arraign Dean and Cipriano on complaints and they thus could and should have been arraigned when those proceedings took place.

We would reverse and remand for a new trial in *Dean* because the statement obtained from him after his courtroom appearance during the reverse-writ proceeding,[22] at which he should have been arraigned and offered an opportunity to obtain counsel, may have significantly added to the other evidence tending to show that he was the killer.

In *Cipriano,* we would reduce the conviction to second-degree murder and remand for resentencing with an option on the part of the prosecutor to retry him for first-degree murder. The evidence tending to show that Cipriano was the killer, other than the statements obtained from him after the search warrant proceeding, was overwhelming. The statements obtained from him after the

---

[22] We recognize that the Sixth Amendment right to counsel may not attach until a complaint is filed. *Moran v Burbine,* 475 US 412; 106 S Ct 1135; 89 L Ed 2d 410 (1986).

search warrant proceeding, at which he should have been arraigned and offered an opportunity to obtain counsel, may, however, have significantly added to other evidence tending to show that the killings were premeditated and deliberate.

D

In *Harrison,* we agree with the majority that Harrison's conviction of manslaughter should be affirmed. Harrison had engaged private counsel before he made the statement sought to be suppressed. He underwent the polygraph examination with the consent of his counsel. The delay in arraigning Harrison did not deprive him of legal representation, nor was his right to counsel otherwise impeded by the police.

E

We would affirm the decision of the Court of Appeals in *People v Harrison.*[23] In *People v Dean,* we would reverse the decision of the Court of Appeals and remand for a new trial. In *People v Cipriano,* we would reduce the conviction to second-degree murder with an option on the part of the prosecutor to retry the defendant for first-degree murder.[24]

LEVIN and ARCHER, JJ., concurred with CAVANAGH, J.

---

[23] In agreeing with the majority in affirmance, we do not adopt the analyses employed therein.

[24] *Id.*