**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 09a0003n.06
Filed: January 6, 2009

**No. 07-2287**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| JOSHUA DAVIS, | ) | |
| | ) | **ON APPEAL** FROM THE |
| **Petitioner-Appellee.** | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| v. | ) | DISTRICT OF MICHIGAN |
| | ) | |
| KURT JONES, Warden, | ) | **O P I N I O N** |
| | ) | |
| **Respondent-Appellant.** | ) | |

BEFORE: NORRIS, BATCHELDER, and GIBBONS, Circuit Judges.

ALAN E. NORRIS, Circuit Judge. Warden Kurt Jones, represented by the Michigan Attorney General ("the State"), appeals from a conditional grant of habeas corpus to prisoner Joshua Davis. At issue on appeal are two statements made to the police by petitioner and introduced against him by the State during trial. The district court granted relief on two grounds: 1) petitioner's Fifth Amendment rights were compromised by the manner in which the statement given on the night of his arrest was obtained; 2) trial counsel provided constitutionally ineffective assistance by failing to challenge the admission of a later statement on the ground that petitioner's arraignment had been inexcusably delayed.

We conclude that the Michigan Court of Appeals did not run afoul of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, when it concluded that both statements were constitutionally admissible.

**I.**

Petitioner was charged with carjacking and first-degree felony murder. He and co-defendant Richard Kimble were tried jointly and convicted on March 13, 2000 after a four-day trial.[1] The trial judge sentenced petitioner to a term of imprisonment between twenty-eight and seventy years. The Michigan Court of Appeals affirmed the conviction. *People v. Davis*, No. 227330, 2002 WL 1747966 (Mich. Ct. App. July 23, 2002). Petitioner's *pro se* delayed application for leave to appeal to the Michigan Supreme Court was denied.

This action stems from the fatal shooting of Monique Trotty on June 23, 1999. She and her companion, Victor Caldwell, were confronted by a young man when they pulled into the driveway of their residence. He smashed the window of the driver's door and demanded that Ms. Trotty step out of the car. She complied, as did Mr. Caldwell, who held the couple's one year-old son. After Mr. Caldwell took their son into the house and told his mother to call the police, he re-emerged to check on the situation. The assailant had driven away and Ms. Trotty indicated that she had been wounded by a gunshot to the shoulder. She later died.

As already mentioned, petitioner made two statements to the police describing his role in the offense. Prior to trial he challenged the voluntariness of those statements. Pursuant to Michigan law, the court conducted a *Walker* hearing in order to determine whether or not the State could introduce those statements at trial. *See People v. Walker*, 132 N.W.2d 87, 91 (Mich. 1965). In his brief to the Michigan Court of Appeals, petitioner summarized the testimony introduced at the

---

[1] Petitioner and Kimble were convicted of second-degree murder, Mich. Comp. Laws § 750.317, but acquitted of carjacking.

hearing. After the instant habeas petition was filed, the district court referred the matter to a

magistrate judge for a report and recommendation. The subsequent report incorporated petitioner's

summary verbatim. Given that the State did not object to this recital, we include it below:

> Officer Steven Allen . . . investigat[ed] the carjacking and the death of Monique Trotty, and had received information from another officer that Rex Bradley knew someone who had been present when the shooting occurred. Officer Allen met Mr. Bradley at a Burger King at about 6:00 p.m. on Friday, June 25, 1999. At that time, the police had some leads in the case, but had no leads mentioning Joshua Davis. After Allen and Bradley talked for a while, Joshua Davis also came into the restaurant. At that point Davis was not under arrest, and he talked with Allen for about an hour and a half. Officer Allen decided that Davis was involved in the crime and told Davis that he had to come downtown to make a formal statement in writing. Officer Allen denied that Mr. Davis asked for a lawyer or said that he did not want to go downtown without a lawyer. At the homicide division at police headquarters . . . Joshua Davis waived his *Miranda* rights and made an oral and written statement.

> Officers Michelle Jones and Michael Russell testified that they interrogated Joshua Davis at police headquarters at about 1:15 in the afternoon on Monday, June 28. Mr. Davis waived his *Miranda* rights and made an oral and written statement.

> Rex Bradley and Defendant Joshua Davis testified for the defense at the suppression hearing. Mr. Bradley said that at his office at a cellular telephone company Davis had said that he wanted help. Mr. Davis told Bradley that he knew about the carjacking, but that he had not been involved in the killing and had not even known that a woman had been murdered until he saw it the next day on the news. Mr. Bradley advised Davis to talk to the police and that if he was not directly involved he should not have a problem, and then arranged with Officer Allen for the meeting at the Burger King. Defense counsel asked if during the conversation at the Burger King, "Did Josh say anything about a lawyer?" The prosecutor objected on hearsay grounds that "anything that Josh said about a lawyer should come from Josh. . . . [H]e can't introduce his own statement, it has to be against somebody. It's not against himself." The trial court judge ruled, "I agree. So, I sustain the objection."

> On cross-examination by the prosecutor, Rex Bradley admitted that Joshua Davis had not said that he wanted a lawyer before the meeting at the Burger King.

However, without any question being asked by the prosecutor, Mr. Bradley slipped in the statement, "He did that during the meeting," which annoyed the prosecutor . . . .

Defendant Joshua Davis testified that when he had talked with Officer Steven Allen at the Burger King he had asked for a lawyer at about thirty or forty minutes into their conversation. He had tried to leave the restaurant but was blocked by other police officers, so he told Allen, "I want a lawyer. If I'm not under arrest, but I can't leave, I would like to have a lawyer present." He asked Mr. Bradley to get in contact with the lawyer Bradley had on standby. He also said that he asked for a lawyer when he was interrogated by Officers Jones and Russell.

In rebuttal the prosecutor recalled Rex Bradley, who testified that he had told Joshua Davis that he had the means to have a lawyer for Davis, but that he did not have a particular lawyer at that time.

Defense counsel argued that Joshua Davis had wanted a lawyer and had asked for one, but was not given one. Counsel asked "that both statements be suppressed."

The Circuit Judge denied the motion to suppress, finding that Joshua Davis's statements were voluntarily made. She also found, "the defendant never requested a lawyer at any time."

Report and Recommendation, Mar. 29, 2006 at 4-5 (quoting petitioner's brief to state appellate court in *People v. Davis*, No. 227330, 2002 WL 1747966, at 2-4 (Mich. Ct. App. July 23, 2002) (citations omitted)).

## II.

On direct appeal, petitioner raised the two issues regarding the admissibility of the statements on which the district court eventually granted relief. The Michigan Court of Appeals reached a contrary conclusion. AEDPA provides that a federal court may only grant a writ if the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C.

§ 2254(d)(1). "A federal habeas court may issue the writ under the 'contrary to' clause if the state court applies a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a case differently than [the Supreme Court has] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002); *see generally Fautenberry v. Mitchell*, 515 F.3d 614, 622-23 (6th Cir. 2008) (summarizing AEDPA review).

Because the Michigan Supreme Court denied review, we must determine whether the Michigan Court of Appeals' decision was contrary to clearly established federal law. With respect to the statements made by petitioner on the first day of interrogation, the Michigan trial court made the factual findings that, prior to petitioner's being taken to the police station and read his *Miranda* rights, he never requested an attorney and any statements made to the police were voluntary. Under AEDPA, these findings are afforded a presumption of correctness that is rebuttable only by clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e).

To be sure, it appears that in the process of making these findings the state trial court erred as a matter of Michigan's law of evidence when it sustained a hearsay objection excluding the testimony of Rex Bradley. The excluded testimony bore directly on the trial court's factual finding, as it supported petitioner's argument that he had requested counsel prior to being read his *Miranda* warnings. But this error in applying state evidentiary law, by itself, is not sufficient to disregard the presumption of correctness required by AEDPA. Rather, to rebut that presumption, the record as a whole, including the evidence that the state trial court improperly excluded, must establish by clear and convincing evidence that the state trial court's findings are themselves incorrect. *See* § 2254(e)(1) ("[A] determination of a factual issue made by a State court shallbe preseumed to be

correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence"). The district court, therefore, erred as a matter of law when it disregarded the state trial court's findings for no other reason than the state court's evidentiary error. Considering the entire record, including Bradley's testimony and all other evidence from the federal evidentiary hearing, we cannot conclude that the state court's findings were erroneous. The record contains testimony from Officer Allen that petitioner never requested counsel prior to being read his *Miranda* warnings, as well as testimony from Bradley and petitioner contradicting Officer Allen's testimony. While the record shows that the state trial court *could* have reached contrary conclusions in its findings, it does not establish, by clear and convincing evidence, that the court *must* have reached contrary conclusions. Accordingly, petitioner is not entitled to habeas relief on any claims related to his first statement to police.

We now turn to the admissibility of the statement given by petitioner on Monday, three days after he was first taken into custody and before he was formally arraigned. Although the text of that statement has been omitted from the joint appendix, the parties agree that it places petitioner at the scene of the crime and establishes his active participation. Without it, the State's case would have been significantly weakened. Petitioner's sole contention is that counsel rendered ineffective assistance by not raising the issue of prearraignment delay; he does not argue that the authorities ignored his request for counsel before taking the statement.

The Michigan Court of Appeals focused upon whether the delay had been sufficiently long to require suppression of the statement. It cited *People v. Manning*, 624 N.W.2d 746 (Mich. Ct. App. 2000), for the proposition that "Michigan law does not require the automatic suppression of

a confession given during a prearraignment delay." *Davis* 2002 WL1747966, at *2. Instead, delay

is one of a number of factors to be considered. They include *inter alia* the defendant's education and

intelligence level, his prior criminal experience, the length of the detention, whether the accused was

under the influence of drugs or alcohol, whether he was advised of his right to counsel, and whether

he was subject to deprivation of food or sleep. *Id.* (quoting *People v. Cipriano*, 429 N.W.2d 781,

790 (Mich. 1988)). The Court of Appeals weighed these factors and determined that, "while the

prosecutor acknowledges that a prearraignment delay occurred, under the totality of the

circumstances, defendant's decision to give a second statement was the product of a free and

deliberate choice . . . ." *Id.* at *3.

The standard for establishing ineffective assistance of counsel is a familiar one which has

been recently summarized in these terms:

> Review of an ineffective assistance of counsel claim is governed by *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). To establish ineffective assistance and obtain relief under *Strickland*, [petitioner] must demonstrate that his counsel's performance was deficient and that this deficiency so prejudiced his defense as to render the trial unfair and the result unreliable. *Id.* at 687. "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* To satisfy the prejudice prong of the *Strickland* test, [petitioner] must show that a reasonable probability exists that, but for his counsel's unprofessional errors, the results of the proceeding would have been different. *Poindexter v. Mitchell*, 454 F.3d 564, 570 (6th Cir. 2006). Our review of counsel's performance is "highly deferential and counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. (internal quotation marks omitted).

*Johnson v. Bell*, 525 F.3d 466, 486-87 (6th Cir. 2008).

Approximately 96 hours elapsed between the time of petitioner's arrest and his arraignment. The United States Supreme Court has held that "the Fourth Amendment requires a prompt judicial determination of probable cause as a prerequisite to an extended pretrial detention following a warrantless arrest." *County of Riverside v. McLaughlin*, 500 U.S. 44, 47 (1991) (citing *Gerstein v. Pugh*, 420 U.S. 103 (1975)). Because *McLaughlin* was a civil rights action that did not consider the effect of pre-arraignment delay on the voluntariness of a statement made to authorities, it supplemented, but did not supplant, the following balancing test outlined in *Cipriano*:

> [W]e believe "unnecessary delay" in arraignment is only one of the factors that should be considered in evaluating the voluntariness of a confession. The test of voluntariness should be whether, considering the totality of all the surrounding circumstances, the confession is "the product of an essentially free and unconstrained choice by its maker," or whether the accused's "will has been overborne and his capacity for self-determination critically impaired . . . ." The line of demarcation "is that at which governing self-direction is lost and compulsion, of whatever nature or however infused, propels or helps to propel the confession."

> In determining whether a statement is voluntary, the trial court should consider, among other things, the following factors: the age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured, intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

> The absence or presence of any one of these factors is not necessarily conclusive on the issue of voluntariness. The ultimate test of admissibility is whether the totality of the circumstances surrounding the making of the confession indicates that it was freely and voluntarily made. Unnecessary delay is one factor to consider in reaching this conclusion, the focus being not just on the length of delay, but rather on what occurred during the delay and its effect on the accused.

429 N.W.2d at 790 (citations omitted).

On direct appeal, petitioner contended that trial counsel rendered ineffective assistance by not seeking to exclude his second statement based upon pre-arraignment delay. As mentioned previously, the Michigan Court of Appeals concluded that the delay, which no one disputes, was but one factor in the analysis:

> Defendant was twenty-two years old at the time of his arrest and was recently paroled for a juvenile conviction of armed robbery and felony firearm. Defendant is literate and holds a general equivalency diploma and he was advised of his constitutional rights when he made the statement. No evidence suggests that defendant was ill, intoxicated, or under the influence of drugs; there was also no indication that he had been abused or threatened with abuse, or that he had been deprived of food, sleep, medical attention, or any other necessities. Further, no evidence suggests that the police engaged in repeated or prolonged questioning before defendant gave his statement and he clearly knew that he had the right to an attorney.
>
> In sum, while the prosecutor acknowledges that a prearraignment delay occurred, under the totality of the circumstances, defendant's decision to give a second statement was the product of free and deliberate choice rather than police intimidation, coercion, or deception, notwithstanding any delay in the arraignment.

*People v. Davis*, 2002 WL 1747966 at *2-3 (citation omitted).

Petitioner offers factors that he believes support his contention that the second statement was involuntary: he was held in a hot, single-person cell; he slept on a bare wooden slab; he was fed "unattractive" jail fare; no one came to talk to him; he was not given the chance to make a phone call; and he was grabbed by the collar by Officer Russell prior to giving his statement. In petitioner's view, counsel had no strategic reason not to raise the issue of voluntariness and prejudice followed because the statement was directly inculpatory.

What petitioner fails to appreciate, however, is that we review his claim through the lens of AEDPA, not as the court of the first instance. The Michigan Court of Appeals weighed the record and concluded that the statement was not rendered involuntary by pre-arraignment delay. While petitioner urges us to come to a different conclusion, our task is to determine whether the Court of Appeals' decision was contrary to clearly established federal law. It was not, and petitioner does not offer us any Supreme Court decision to the contrary.

The district court echoed petitioner's argument that counsel was ineffective because there was no "strategic reason for not raising this issue." Counsel is not constitutionally bound to raise every issue; rather, *Strickland* explicitly states that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91. The fact that the Michigan Court of Appeals and the district court disagree on whether the same facts make out a viable claim underscores that the failure to raise it fell within the range of "reasonable professional judgments" that *Strickland* leaves squarely in the hands of trial counsel.

For these reasons, we must reject petitioner's claim that counsel rendered ineffective assistance with respect to his second statement.

### III.

The judgment of the district court is **reversed** and the conditional writ of habeas corpus is **vacated.**

- 10 -