*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

KEYANTE ANDREW-MICHAEL NEWBERN,

        Defendant-Appellant.

UNPUBLISHED
November 17, 2025
10:03 AM

No. 371033
Kent Circuit Court
LC No. 23-004862-FC

Before: LETICA, P.J., and M. J. KELLY and MARIANI, JJ.

PER CURIAM.

Defendant, Keyante Newbern, appeals as of right his jury-trial conviction of first-degree premeditated murder, MCL 750.316(a), carrying a concealed weapon, MCL 750.227, possession of a firearm by a felon (felon-in-possession), MCL 750.224f, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. For the reasons stated in this opinion, we affirm.

## I. BASIC FACTS

On December 26, 2022, at approximately 9:49 p.m., Mya Kelly was shot dead by a bullet fired through the front door of her home on Canton Street in Grand Rapids. Just before the shooting, Kelly had been preparing to watch a movie with her boyfriend. However, she went to the front door after someone knocked. Her boyfriend, Omar Dannah, recounted that Kelly asked "who's there?" a few times. He could hear a mumbled response, but could not make out what was said. Dannah could not determine whether the voice was male or female. He described the voice as "soft spoken. Regular." He added that it was "weird" because it was not recognizable and that it also sounded "like somebody was trying to mimic a voice." Kelly told him that she thought someone was "playing" and then shots rang out. Kelly was struck in the head by a bullet and died immediately.

Kelly's neighbors heard the shots and took cover. They could hear Kelly's children screaming inside her house. After a bit, they knocked on Kelly's door. Dannah answered and tried to get them to help Kelly. It was clear that she was dead. The neighbors took Kelly's children to their home, but left Dannah. They called 911.

-1-

When the police arrived, they searched Dannah and then secured him in a police vehicle. No weapons were located inside the house. Additionally, forensic evidence indicated that the bullet that killed Kelly had been fired through the door from the outside. Three shell casings were recovered. Tool marks on the casings were consistent with a Glock pistol. Additionally, the bullet fragment recovered from Kelly's head was also consistent with a Glock.

The police canvased the area and were able to locate a number of surveillance videos. The videos show that just before the shooting a damaged silver Dodge Journey twice drove by Kelly's house. The second time it passed it pulled into a nearby auto shop and doused the lights. No one got out of the vehicle. The video footage further depicts a man running down Canton after the shooting wearing a two-tone jacket. That man got into the Dodge Journey, which left the auto shop without turning the lights on. Further investigation revealed that the vehicle was driven by Marquis Welch.

At trial, Welch admitted that he drove past Kelly's house twice before she was killed. He stated that the second time he let Newbern, who was his passenger, out of the vehicle before parking at the auto shop. He identified Newbern as the man who ran up to his vehicle and got in. He further admitted that in at least some of his statements to the police, he said that Newbern indicated that he "shot that bitch" after he got back into the vehicle. Welch testified that he left with the lights out, possibly because he forgot to turn them back on. Cellular location data from Newbern's phone indicated that he was in the area around the time of the shooting. Welch's cellular location data, in contrast, only showed that he was heading toward the area of the shooting before he either turned his phone off or placed it into airplane mode. His phone was turned back on after the murder.

Text messages on Welch's phone showed that he had met up with Newbern at a convenience store around 4:30 p.m. on the day of the shooting. Video footage from the store show a man in a two-tone jacket made a purchase around the same time that Welch received a text message from Newbern indicating that he was checking out. There was also evidence that Newbern made a purchase at the store using his credit card at the same time. Cellular location data for both Welch's and Newbern's phones revealed that they were pretty much together after leaving the store.

Welch testified that they went to Newbern's apartment and then to a house that was being rented to film a rap music video. They arrived together. Welch stated that they smoked and drank before filming started, and he acknowledged that Newbern had a gun for some of the music video scenes. The person in charge of the video filming testified that there was no gun at the house before Welch and Newbern arrived. He identified Newbern as holding a gun during the filming, stated that only one gun was present, and admitted that the gun had a blue-lighted laser sight attached to it. Many people possessed the gun in the video, but it was not left at the house. Welch stated that he had provided Newbern with a Glock pistol in June 2022. Welch did not know if the gun in the vehicle was the same one that he had provided to Newbern. Regardless, a photograph of Newbern was also admitted at trial that depicted him with a Glock pistol. That photograph was dated April 2022.

The police obtained a search warrant for Newbern's location data and used it to track his location to a residence in Lansing, Michigan. Thereafter, a search warrant on that address was executed. The home belonged to Newbern's aunt, who testified that he had come for a visit. She stated that he was asleep when the police arrived. Newbern was taken into custody and transported to the courthouse to provide testimony pursuant to an investigative subpoena. In that testimony, he denied ever being at Canton Street, denied having a gun or anything resembling a gun on the date that Kelly was murdered, and denied travelling with Welch to or from the music video shoot. During a later search of a Wyoming, Michigan residence associated with Newbern, the police located a blue-lighted laser site. The gun used in the shooting, however, was never recovered.

## II. PROSECUTORIAL MISCONDUCT

### A. STANDARD OF REVIEW

Newbern first argues that the prosecutor committed misconduct by eliciting "extensive" testimony from Detective Sean Wolf regarding two local gangs. Newbern did not contemporaneously object to the gang-related testimony and request a curative instruction. As a result, the issue is unpreserved. See *People v Bennett*, 290 Mich App 465, 475; 802 NW2d 627 (2010) ("In order to preserve an issue of prosecutorial misconduct, a defendant must contemporaneously object and request a curative instruction."). Unpreserved claims of prosecutorial misconduct are reviewed for plain error affecting the defendant's substantial rights. *People v Thomas*, 260 Mich App 450, 454; 678 NW2d 631 (2004). "The first two prongs of the plain-error standard require that an error exist and that it be obvious." *People v Randolph*, 502 Mich 1, 11; 917 NW2d 249 (2018). The third prong requires that the defendant show "prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id*. at 10 (quotation marks and citation omitted). "Reversal is warranted only when plain error resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Bennett*, 290 Mich App at 475-476 (quotation marks and citation omitted). This Court "cannot find error requiring reversal where a curative instruction could have alleviated any prejudicial effect." *Id*. at 476 (quotation marks and citation omitted).

Alternatively, Newbern argues that his lawyer provided constitutionally deficient assistance by failing to object to the gang-related testimony. He filed a motion for remand with this Court, which we denied. "When no *Ginther*[1] hearing has been conducted, our review of the defendant's claim of ineffective assistance of counsel is limited to mistakes that are apparent on the record." *People v Mack*, 265 Mich App 122, 125; 695 NW2d 342 (2005).

### B. ANALYSIS

"[T]he test for prosecutorial misconduct is whether a defendant was denied a fair and impartial trial." *People v Dobek*, 274 Mich App 58, 63; 732 NW2d 546 (2007). "A defendant's opportunity for a fair trial can be jeopardized when the prosecutor interjects issues broader than the defendant's guilt or innocence." *Id*. at 63-64. Allegations of prosecutorial misconduct are reviewed on a case-by-case basis. *Id*. at 64. Further, they are considered in context, *People v*

---

[1] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

*Solloway*, 316 Mich App 174, 201; 891 NW2d 255 (2016), because "[t]he propriety of a prosecutor's remarks depends on all the facts of the case," *Dobek*, 274 Mich App at 64.

In his investigative-subpoena testimony, which was admitted as an exhibit, Newbern mentioned two groups: "Bemis" and the "Horton Boys." After Newbern's investigative-subpoena testimony was played for the jury, the prosecutor asked Grand Rapids Police Detective Sean Wolf a number of questions regarding the video, including the following:

> *Q*. Just so the jury has some idea, what—what are Horton Boys?
>
> *A*. Horton Boys are a local gang, essentially.
>
> *Q*. Also the defendant references Bemis. Do you recall that on the interview?
>
> *A*. Yes, another local gang.
>
> *Q*. And where is—strike that. Is Bemis a street also in the city of Grand Rapids?
>
> *A*. It is also a street, yes.
>
> *Q*. What—where is Bemis Street in relation of Canton Street?
>
> *A*. I—I honestly can't say right now. I'm not very good with those directions.
>
> *Q*. And you don't know if they're on the same side of town or not.
>
> *A*. I don't believe they're on the same side of town, but I can't say that for sure.

On appeal, Newbern characterizes the above testimony as "extensive" and asserts that it was improper because there was no evidence in this case of a connection between Newbern's conduct and gang affiliation. He further suggests that the prosecutor was attempting to inflame the passions of the jury by insinuating that Newbern's motive for murdering Kelly was gang related. Newbern relies on *People v Wells*, 102 Mich App 122; 302 NW2d 196 (1980) as support for his argument that the gang-related testimony was improper. In *Wells*, the prosecution admitted "extensive evidence of past gang rivalry and individual episodes of violence" between two motorcycle gangs in order to provide the jury with "background" and to establish that the defendant had a motive. *Id.* at 125. However, there was no evidence that the defendant was a member of the gangs involved, that he knew of their allegedly violent activities, or that the rivalry between them had any bearing on his conduct. *Id.* at 129. As a result, the *Wells* Court concluded that the gang-related evidence was inadmissible because it was not relevant. *Id.*

Unlike the prosecutor in *Wells*, the prosecutor in this case only briefly introduced evidence that the two groups mentioned by Newbern were local gangs. She did not use that evidence to suggest that Newbern's motive for murdering Kelly was gang related, nor did she argue that Newbern was a member of either gang. Newbern suggests that the prosecutor had an improper motive because she asked the detective questions regarding the location of Bemis Street in relation to Canton Street. The detective, however, stated that he did not know where the streets were in relation to each other and he only speculated that they might be on different sides of town. Questions posed to a witness by a lawyer are not evidence. See *People v Unger*, 278 Mich App 210, 237; 749 NW2d 272 (2008). Thus, even assuming that the prosecutor was hoping to insinuate that there were gang-related considerations at issue, the detective's answers did not support her theory. Instead, viewed in context, the evidence elicited from Detective Wolf was rather innocuous. If the prosecutor had desired to insinuate that Newbern's motive for murdering Kelly was gang related, she would have been better served directing the jury to Newbern's testimony during the investigative subpoena that he could "not even be" on the same side of town that Canton Street was on because it was not his "playground." She could have also referenced his statements indicating familiarity with two different gangs. But she did not do so. Instead, besides asking Detective Wolf questions regarding the nature of the groups mentioned by Newbern, the prosecutor refrained from bringing up the topic of gangs, gang affiliation, or gang motivation for the murder.

Given the brief and limited scope of the gang-related evidence, its innocuous nature, and the fact that no unfairly prejudicial inferences were argued based upon the admitted evidence, we conclude that Newbern has failed to establish a clear or obvious error. Moreover, in light of the substantial evidence indicating that Newbern was the person who shot Kelly to death—which includes video footage, cellphone location analysis, eyewitness testimony placing him at the scene of the shooting, and evidence that he was in possession of a gun on the day of the shooting—we further conclude that, even if there were a plain error, Newbern has not established that the alleged prosecutorial misconduct affected his substantial rights.

Newbern alternatively argues that his lawyer was ineffective because he did not object to the gang-related testimony. To establish ineffective assistance by his lawyer, a defendant must show the lawyer's performance was objectively deficient and that the deficiencies prejudiced him. *People v Nix*, 301 Mich App 195, 207; 836 NW2d 224 (2013). In order to establish prejudice, the defendant must show that, but for his lawyer's error, "the result of the proceeding would have been different." *Id*. A defense lawyer is not, however, ineffective for failing to raise a futile or meritless objection. *People v Isrow*, 339 Mich App 522, 532; 984 NW2d 528 (2021). Because no improper testimony was admitted, any objection to the testimony would have been futile. As a result, Newbern cannot establish ineffective assistance predicated on his lawyer's failure to object to the gang-related testimony.

## III. ADMISSIBILITY OF INVESTIGATIVE-SUBPOENA TESTIMONY

### A. STANDARD OF REVIEW

Newbern argues that his investigative-subpoena testimony is inadmissible because it was not voluntary and understanding as he was high, intoxicated, and sleep deprived when he testified. At trial, Newbern's lawyer objected to the investigative-subpoena testimony on the basis that it

-5-

was involuntary, but he did not reference Newbern's claims to be high, intoxicated, and sleep deprived. Consequently, this issue is not preserved for review. See *People v Aldrich*, 246 Mich App 101, 113; 631 NW2d 67 (2001) ("To preserve an evidentiary issue for review, a party opposing the admission of evidence must object at trial and specify the same ground for objection that it asserts on appeal."). Unpreserved evidentiary errors are reviewed for plain error affecting the defendant's substantial rights. *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999).

## B. ANALYSIS

In *People v Seals*, 285 Mich App 1; 776 NW2d 314 (2009), this Court addressed the admissibility of a defendant's investigative-subpoena testimony. The *Seals* Court explained that "[a] prosecutor may, in certain instances, offer evidence that an exculpatory statement is false as circumstantial evidence of guilt." *Id*. at 5. In order to be admissible, the proved-to-be-false exculpatory statements must have been voluntarily given by the defendant. *Id*. at 6. In evaluating whether the defendant's testimony was voluntary, the *Seals* Court noted that, under MCL 767A.5, before testifying pursuant to an investigative subpoena, a person is entitled to have a lawyer present in the room and is free to "discuss fully" with his or her lawyer "any matter relating to" his or her part in the matter being investigated "without being subject to citation for contempt." *Id*. at 7, quoting MCL 767A.5. Further, the prosecuting attorney conducting the investigative-subpoena inquiry is statutorily required to advise the person subject to the subpoena "of his or her constitutional rights regarding compulsory self-incrimination before asking any questions[.]" *Id*., quoting MCL 767A.5. And, under MCL 767A.6, if a person refuses to comply with an investigative subpoena, then the prosecuting attorney can seek court assistance to compel the person's testimony. *Id*. at 8, citing MCL 767A.6. The court, however is expressly prohibited from compelling "the person to answer a question . . . if answering that question . . . would violate a statutory privilege or a constitutional right." *Id*. at 8, quoting MCL 767A.6(5).

The *Seals* Court concluded that the defendant's failure to "take advantage of his opportunity to have the trial court determine whether he was required to respond to the investigative subpoena [did] not make [the defendant's] testimony forced." *Id*. at 8-9. Moreover, the court noted that there was no suggestion that the defendant was not advised of his right to have a lawyer present or of his constitutional right against self-incrimination. *Id*. at 7-8. Instead, the defendant "was under oath, was advised that he could have counsel present, and was advised of his Fifth Amendment privilege before he provided statements in an effort to exculpate himself." *Id*. at 6. Based upon the foregoing, the court determined that the defendant's testimony was admissible. *Id*. at 6.

Turning to the facts of this case, Newbern argues that his testimony was involuntary based upon his claims that he was high, intoxicated, and sleep deprived. The defendant in *Seals* was not intoxicated, high, and sleep deprived when he gave his testimony. As such, it is not dispositive. Instead, we must consider the voluntariness of Newbern's statements using the factors set forth in *People v Cipriano*, 431 Mich 315, 334; 429 NW2d 781 (1988), i.e., the *Cipriano* factors. In *Cipriano*, our Supreme Court explained that to determine whether a defendant's statement is voluntary, the following should be considered:

the age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured, intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse. [*Id.*]

No one factor is dispositive. *Id.* Instead, "[t]he ultimate test of admissibility is whether the totality of the circumstances surrounding the making of the confession indicates that it was freely and voluntarily made." *Id.*

Newbern contended that he had not "been to sleep." He also asserted that he was "high on coke" and that he was "intoxicated." Addressing the latter claims first, the record indicates that no drug or alcohol tests were administered. At trial, Detective Wolf agreed that the fact that Newbern was "laughing" at inappropriate times during the questioning could have indicated that he was high at the time. But Detective Wolf added that Newbern had affirmed multiple times during his testimony that he understood the proceedings. As it relates to Newbern's claim that he was sleep deprived, his investigative-subpoena testimony is contradicted by his aunt's trial testimony that Newbern was asleep before the police arrived to execute the search warrant on her house around 5:30 a.m. or 6:30 a.m.

Regardless, given that this issue is unpreserved, the burden is on Newbern to establish plain error affecting his substantial rights. He has not done so. Instead, he points only to his own self-serving statements during his testimony that he was high, intoxicated, and sleep deprived. He does not direct this Court to any physical signs of his allegedly impaired mental state, such as slurred speech, instances where he had difficulty answering questions, or indications that he was having difficulty remaining awake (such as yawning or nodding his head and then jerking awake). Having watched the video multiple times, we are unable to pinpoint any clear or obvious instances where it appears that his answers to the questions posed were impacted by his allegedly impaired mental state. Instead, when answering the questions, he confirmed that his answers were reasonable and rational and that he understood them. Further, he suggested that, although he was "intoxicated right now," he was "drunk-drunk" the night of the murder. This suggests that he was drawing a distinction between his functional intoxication that he was exhibiting and his allegedly "really intoxicated" and "drunk-drunk" state on the night of the murder. We conclude that, on a plain error review, Newbern has not established that he was clearly or obviously impaired by alcohol, drugs, or lack of sleep when he testified.

Additionally, even if we were to conclude that Newbern established that it was clear or obvious that he was high, intoxicated, and sleep deprived, that is only one of the *Cipriano* factors. The remaining factors—which he does not address—weigh in favor of a finding that his statements were voluntary.

One *Cipriano* factor looks at whether the defendant was advised of his constitutional rights. *Cipriano*, 431 Mich at 334. Here, the prosecutor explained that Newbern had a lawyer present when he gave his statements under oath. He also had his statutory rights read to him, which included his right to refuse to answer a question if it would incriminate himself. The prosecutor explained that, with his lawyer present, Newbern waived that right and agreed to answer questions. Detective Wolf further confirmed in his testimony that Newbern had his lawyer present, was read his constitutional rights, and had the opportunity to consult with his lawyer, who was present for the duration of the interview. This factor, therefore, supports a finding that the testimony was voluntary.

Next, Newbern was sentenced as a fourth-offense habitual offender, MCL 769.12, which shows that he was familiar with the criminal justice system. He was 29-years-old at the time the offense was committed. Although the presentence investigative report (PSIR) indicates that he only had an eleventh-grade education, there is nothing in the record to suggest that Newbern had below average intelligence. Thus, Newbern's age, prior experience with the police, and his education and intelligence, see *id*., do not compel the conclusion that Newbern's testimony was involuntary.

Another factor requires consideration of the length of detention before Newbern gave his statement. *Id*. The police executed the search warrant on his aunt's house around 5:30 or 6:30 a.m., and Newbern gave his investigative-subpoena testimony at approximately 11:30 a.m. the same day. Thus, there was not a lengthy delay between the time when he was detained by the police and when he was questioned. Other *Cipriano* factors require consideration of whether Newbern was injured or in ill health, deprived of food or medical attention, physically abused, or threatened with abuse. *Id*. There is nothing on the record indicating that Newbern was in ill health, deprived of food or medical attention, was physically abused, or was threatened with abuse. Another *Cipriano* factor looks at whether the questioning was repeated and prolonged. *Id*. The entirety of Newbern's investigative-subpoena testimony lasted for just under 27 minutes. And based upon review of the video of the proceedings, it is apparent that Newbern was not badgered with aggressive, repeated, and prolonged questioning. Indeed, the questions were polite and professional.

In sum, considering the totality of the circumstances, the *Cipriano* factors militate toward a finding that Newbern's testimony was voluntary. Accordingly, even if this issue were raised before the trial court, Newbern cannot show that the evidence would have been excluded. On this record, Newbern has not established that the admission of his investigative-subpoena testimony was plain error affecting his substantial rights.

In the alternative, Newbern argues that his lawyer was ineffective for agreeing that he could not see a meaningful distinction between the facts of Newbern's case and the facts in *Seals*. More specifically, he contends that his lawyer provided deficient assistance by not arguing that his statement was involuntary because he was high, intoxicated, and sleep deprived. As indicated above, however, the totality of the circumstances indicates that Newbern's testimony was, in fact, voluntary. Consequently, any objection would have been futile and cannot form the basis of an ineffective-assistance claim. See *Isrow*, 339 Mich App at 532.

## IV. FAILURE TO CALL WITNESS

### A. STANDARD OF REVIEW

Newbern next contends that his lawyer provided him with constitutionally ineffective assistance by failing to call two eyewitness whose statements were recorded by the police. Because no evidentiary hearing was held, this Court reviews for errors apparent on the record. See *Mack*, 265 Mich App at 125. Newbern's motion, however, relies upon information that is not included in the lower court. Although a party may not generally expand the record on appeal, *Nix*, 301 Mich App at 203, we have discretion to permit such an expansion on "just" terms, MCR 7.216(A)(4). We exercise such discretion in this case and will therefore consider the accounts of the two witnesses identified on appeal.

### B. ANALYSIS

A defendant raising a claim of ineffective assistance must establish that his lawyer provided deficient performance and that he or she was prejudiced by that deficient performance. *Nix* 301 Mich App at 207. "The defendant has the burden of establishing the factual predicate of his ineffective assistance claim." *People v Douglas*, 496 Mich 557, 592; 852 NW2d 587 (2014). "This Court does not second-guess counsel on matters of trial strategy." *People v Traver*, 328 Mich App 418, 422; 937 NW2d 398 (2019). It is presumed that decisions related to calling and questioning witnesses are matters of trial strategy. *People v Putman*, 309 Mich App 240, 248; 870 NW2d 593 (2015).

Here, the first potential witness reported that after hearing gunshots he saw two black males running from the area. Although testimony that two men ran from the scene could have been used to argue that Newbern was not the shooter, there was substantial evidence that Newbern was one of the black men that ran from the scene. Specifically, cell phone location data placed him in the area, as did Welch's testimony, and video footage depicting him in a two-tone jacket earlier in the day and at the time of the shooting. There was also Welch's testimony that Newbern asked to be dropped off at Kelly's address and that he indicated after the shooting that he "shot that bitch." The witness's potential testimony, therefore, would have strongly corroborated the prosecutor's theory of the case. Accordingly, notwithstanding that Newbern's lawyer could have tried to shift blame from Newbern to the man that ran in a different direction, Newbern's lawyer could have decided that any benefit would be outweighed by the fact that he would be bringing additional evidence corroborating the prosecutor's theory. There is also the very real possibility that, if asked to identify the person that he saw running north, the witness would have testified that he saw Newbern. That would have further bolstered the prosecutor's case. Moreover, Newbern's lawyer's theory of the case was that the shooter was a "white male" based upon statements that Kelly's boyfriend allegedly made to a police officer. Testimony that the person running from the scene was a black male would have contradicted that theory. In sum, given that the witness's report strongly corroborated the prosecutor's theory of the case, could result in the in-court identification of Newbern, and contradicted part of the defense theory, we conclude that Newbern's lawyer was not ineffective for failing to call that witness at trial.

As it relates to the second witness, Newbern contends that that witness described the person running from the scene as being 5'7 or 5'8, whereas he is 6'1. Although that fact is favorable to the defense, the witness also testified that the man running was wearing a two-tone jacket. Given the substantial video and eyewitness evidence indicating that Newbern was wearing a two-tone jacket, the witness's testimony would strongly corroborate the prosecutor's theory that Newbern was the shooter. Accordingly, Newbern's lawyer could have reasonably concluded that bringing up the height discrepancy between the description of the runner and Newbern would not outweigh the harm the testimony could cause.

## V. SUPPLEMENTAL BRIEF

Newbern raises additional issues in a supplemental brief filed under Administrative Order 2004-6, Standard 4. We address each in turn.

## A. MOTION IN LIMINE

Newbern argues that evidence that he possessed a gun during the music-video filming was not relevant, that it should have been excluded under MRE 403's balancing test, and that it was impermissible character evidence under MRE 404(b). We disagree.

Evidence is only admissible if it is relevant. MRE 402. "Evidence is relevant if: (1) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." MRE 401. Here, Newbern was charged with open murder, carrying a concealed weapon, felon-in-possession, and felony-firearm. The prosecutor's theory was that Newbern used a Glock pistol to shoot Kelly through the door of her home. The evidence—in the form of shell casings and a recovered bullet fragment—indicated that the gun used to kill Kelly was a Glock pistol. The music video and testimony established that Newbern had possession of a similar pistol on the same day as the shooting. The fact that Newbern had possession of a gun of the same type as that used to murder is a fact of consequence that makes it more probable that Newbern is the person who shot her dead. Likewise, the fact that Newbern had possession of a gun made it more probable that he committed the offenses of felony-firearm, felon-in-possession, carrying a concealed weapon. Evidence that a defendant has possession of the same type of weapon that is used in the charged offense "is routinely determined by courts to be direct, relevant evidence of [the defendant's] commission of that offense." *People v Hall*, 433 Mich 573, 580-581; 447 NW2d 580 (1989).

Newbern maintains that even if relevant the evidence should have nevertheless been excluded under MRE 403's balancing test. Relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice . . . ." "Unfair prejudice occurs when there exists a danger that marginally probative evidence will be given undue or preemptive weight." *People v Beck*, 510 Mich 1, 20; 987 NW2d 1 (2022) (quotation marks and citation omitted). On appeal, Newbern characterizes the evidence as having only "minimal probative value." We disagree. A key fact that the prosecution had to prove was that Newbern had possession of a gun and that he used that gun to murder Kelly. Evidence showing him in possession of a similar type of gun on the same day as the murder clearly has substantial probative value, especially when considered in connection with evidence that he had received the same type of gun from Welch and had been depicted with the same type of gun in an earlier photograph.

Newbern suggests that the evidence could be used to improperly suggest that he is a "chronic pistol possessor." However, because the evidence in the music video only shows him in possession of a pistol on the day of the shooting, such an inference is not reasonably drawn from the evidence. On this record, the trial court did not abuse its discretion by not excluding the evidence under MRE 403.

Finally, Newbern contends that the music-video evidence was inadmissible other-acts evidence under MRE 404(b). But MRE 404(b) only provides that "[e]vidence of any *other* crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." (Emphasis added). Here, evidence that Newbern possessed a pistol on the same day that Kelly was killed with a pistol was evidence that he killed Kelly and that he used a firearm to kill her. It also was directly relevant to establish the charges of felon-in-possession and carrying a concealed weapon. No intermediate character-to-conduct inference was necessary. See *People v Jackson*, 498 Mich 246, 262; 869 NW2d 253 (2015) (indicating that because MRE 404(b) only applies to evidence of "other" crimes, wrongs, or acts, evidence directly supporting that the defendant committed the charged offense is not precluded by MRE 404(b)). See also *People v Houston*, 261 Mich App 463, 468–469; 683 NW2d 192 (2004), aff'd on other grounds 473 Mich 399 (2005) (stating that MRE 404(b) is not implicated if the evidence is "directly relevant to identify [the] defendant as the killer and [does] not involve an intermediate inference of character."). The music-video evidence, therefore, is not inadmissible under MRE 404(b) because it is evidence of the charged crimes, not evidence of any "other" crime, wrong, or act.

## B. SEARCH WARRANTS

Finally, Newbern indicates that the search warrant that allowed the police to seize his cell phone and the search warrant that allowed the police to search his phone's contents were invalid because their supporting affidavits did not establish probable cause. He contends that his lawyer provided ineffective assistance by failing to challenge those warrants. Because the issue was not raised in the lower court, our review is for plain error affecting Newbern's substantial rights. See *Carines*, 460 Mich at 763-764. And his claim of ineffective assistance is limited to mistakes apparent on the record. See *Mack*, 265 Mich App at 125.

Several warrants were issued in this case. Newbern has provided the warrant and affidavit supporting a search of his aunt's residence and the warrant and affidavit requiring his cell phone provider to turn over certain location, call, and text data. He does not challenge the propriety of those warrants, however. Instead, he first argues that the affidavit supporting the search of his cell phone was not supported by sufficient probable cause. Because that affidavit—and the search warrant issued—have not been supplied on appeal, we conclude that Newbern has not established plain error affecting his substantial rights. See *Carines*, 460 Mich at 763-764. Further, he has not established the factual predicate for his ineffective assistance claim based upon his lawyer's failure to challenge that affidavit and warrant. See *Douglas*, 496 Mich at 592.

Furthermore, it appears that Newbern is also challenging the search warrant of "his residence" that authorized the seizure of his cell phone. He suggests that there was no evidence linking his phone to the crime. He does not indicate what address is "his residence." However, his aunt testified that he was only visiting her house. Further, the address he identified as his

residence in his investigative-subpoena testimony was his mother's address. No search of that residence occurred. Thus, by process of elimination, it is likely that he is referring to the search of his girlfriend's house, which appears to be where he was residing. Again, however, the search warrant and supporting affidavit have not been supplied. As a result, Newbern cannot establish plain error affecting his substantial rights. See *Carines*, 460 Mich at 763-764. And he cannot establish the factual predicate for his ineffective assistance claim. See *Douglas*, 496 Mich at 592.

     Affirmed.

/s/ Anica Letica
/s/ Michael J. Kelly
/s/ Philip P. Mariani